Argued May 16, 1922, modified January 2, former decree modified and rehearing denied March 13, motion to recall mandate denied with supplemental order March 28, 1923.

# HUSON *v.* PORTLAND & SOUTHEASTERN RAILWAY CO. ET AL.

(211 Pac. 897; 213 Pac. 408.)

**Equity—Objection That Remedy at Law is Adequate Waived by Answer in Equity.**

1. Where a court of law and a court of equity have concurrent jurisdiction, if the plaintiff resorts to equity, the objection that he has an adequate remedy at law is waived by answering to the merits.

Pleading—Relief may be Obtained by One Defendant Against Another.

2. It is proper for several defendants to cross-plead with each other and relief may be obtained by one defendant against another.

Frauds, Statute of—Enterprise in Nature of Copartnership not Within Operation of Statute.

3. An enterprise in the nature of a copartnership which has for its purpose the purchase, improvement, and sale of real estate for the profit arising therefrom, to be divided among the joint adventurers, as among partners, and which does not undertake to operate upon the ownership and title to the realty, is not within the operation of the statute.

Joint Adventures—Controversy Involving Interest of Parties in Joint Adventure Within Equitable Jurisdiction.

4. The interests of parties to a joint adventure and the matter of the preservation of the rights of all parties are matters of which a court of equity has complete jurisdiction.

Frauds, Statute of—Statute Should not be Made Instrument of Fraud.

5. One cannot, after contracts in dispute have been executed and the benefits thereof realized, be heard to say that the contracts are void under statute, as the statute should not be made an instrument of fraud.

Joint Adventures—Immaterial in Whose Name Title Taken.

6. Where property is purchased as a joint venture, it is not material in whose name the title is taken, as anyone holding the title will be regarded as trustee for his associates; and property paid for out of the receipts of the joint adventure becomes the joint property of all the parties.

Corporations—Decision of Stockholders and Directors as to Value of Property Taken in Purchase of Stock Conclusive.

7. Where all the stockholders and directors of a railway corporation in fixing the value of property which the corporation was accepting in payment for one half of its stock were acting in good faith, their judgment as to the value of the property was conclusive as to everyone who participated in and had knowledge of the transaction, and who did not dissent from the action taken, under Section 6872, Or. L.

Corporations—Courts have No Power to Call Corporate Meetings.

8. Courts have no power to call corporate meetings except by *mandamus*.

---

3. Partnership agreement for purchase and sale of land as within statute of frauds, see notes in 7 Ann. Cas. 1142; 13 Ann. Cas. 140; Ann. Cas. 1913E, 567.

8. *Mandamus* to compel calling of stockholders' or directors' meeting, see notes in L. R. A. 1915E, 774.

**Corporations—Not Bound by Acts Done Before Existence.**

9. Corporations cannot be bound by acts done or promises made in their behalf before they came into existence, since until organized a corporation has no being, franchises, or faculties and its promoters are in no sense identical with the corporation, and do not represent it in any relation of agency and have no authority to enter into preliminary contracts binding the corporation, unless so authorized by the charter.

**Corporations—Corporation not Liable for Contributions Unless All Parties Promoting It so Understood.**

10. In order for a corporation to be liable for contributions made before its organization, it must have been understood and agreed by all parties concerned in its promotion that the corporation should be liable.

From Multnomah: ROBERT G. MORROW, Judge.

In Banc.

In this controversy the plaintiff H. S. Huson and the defendants, Myler Construction Company, J. F. Watson, James T. Barron, M. G. Munly and E. C. Denny, are allied together in interest, all of them being cross-appellants. The defendants, Portland and Southeastern Railway Company, Michael Lynott, S. C. Spencer, J. F. Quirk, E. P. McMahon, W. B. Meredith, Isabella Meredith and J. F. Chisholm, are allied together in interest. The first four of the latter group are appellants herein.

The history of the transactions involved, as claimed by the different parties in their briefs, is substantially as follows: In 1915, the defendant Michael Lynott of Portland, Oregon, conceived the idea of locating a railway from Salem, Oregon, by way of Stayton and Niagara across the Cascade Mountains through Minto Pass to Bend, Oregon. In 1916, he changed the westerly terminus of the project to Mount Angel, Oregon, and decided to connect the railway with the City of Portland, Oregon, by whatever method seemed most available in the future. This change, as it is claimed by the defendant Munly,

was made at the instigation of the defendant Munly. In the fall of 1915, Lynott commenced acquiring the necessary data for the project, and thereafter made surveys and acquired rights of way contracts and deeds and franchises. In the fall of 1915, his brother-in-law, defendant E. P. McMahon of Bellevue, Ohio, became interested in the project and Lynott sold him a one-fourth interest therein, as claimed for the sum of $7,500, and it was agreed that the legal title to all of the property then acquired and thereafter to be acquired for the project should be put in the name of McMahon, as trustee for all parties interested.

About September 15, 1917, Lynott sold to defendant Isabella Meredith, a sister of McMahon, for the alleged consideration of $5,000 cash, an undivided one-sixteenth interest in his railway project and the property acquired therefor, and delivered to her a written contract as evidence of her interest, signed by himself and by McMahon, as trustee.

In 1916, Lynott also sold partly for services and partly for cash to defendant J. E. Chisholm, an undivided one thirty-second interest in the project and property, and on October 14, 1918, he sold to defendant J. F. Watson, an undivided one-sixteenth interest in the project and property, and gave to Chisholm and Watson each a written contract as evidence of their respective interests.

About June, 1917, Lynott approached defendant M. G. Munly with a view to obtaining his aid in furthering the project. Munly at first refused to join Lynott. At that time, as claimed by Munly, he suggested to Lynott that a project that would ultimately connect more directly with Portland would be more attractive and feasible and directed Lynott's

attention to Mount Angel as being the terminus of the Willamette Valley Southern Railway which was already constructed and in operation from Oregon City and within easy reach of Portland, and proposed that the project should include a line commencing at the town of Mount Angel running through Silverton and Sublimity and connecting up with the Salem Survey at Stayton. About January, 1917, Lynott again sought Munly's aid in promoting the project. As claimed by Munly, it was mutually agreed that he should join in the adventure, should act as the general attorney therefor and render such other services in connection with the promotion of the project as might be required of him, and should receive for compensation a substantial interest in the project. Munly claimed that at first his interest was not definitely fixed, but afterwards it was agreed that he should have an undivided one-eighth interest therein.

On the part of Lynott it is claimed that Munly informed him that he was not financially in a condition at that time to purchase an interest, but that he was willing to perform some legal services in connection with the project, and to assist in securing finances for the development of the enterprise, and was certain he could bond the project when it had been developed up to a stage where it was ready to be bonded, and he was willing to look for his compensation to what he could make in bonding the project. Lynott claims that he accepted this offer of Munly's. In 1918, Munly furnished $1,058 for the purpose of making surveys.

Munly suggested the advisability of engaging the plaintiff Huson who had been assistant chief engineer in the construction of the Northern Pacific Railway

and had a recognized standing. Huson had been consulted by Lynott in 1916. About November 12, 1917, Lynott employed him as chief engineer for the railroad project at a salary of $200 per month, and it is asserted on the part of Huson that in addition thereto Lynott agreed to pay him further compensation of one-eighth interest in the project. Huson was paid about $460. He worked 23.3 months, the value of which services is estimated at $20,833.

In November, 1917, James T. Barron became interested in the project largely through defendant Munly's efforts. For a consideration of $3,500 a declaration of trust in writing executed by McMahon was issued to him conveying an undivided one-eighth interest in the project. Later Barron became actively associated with the venture.

In 1918, E. C. Denny contributed in money and labor the sum of $830. There was issued to him a contract in writing in the name of the trustee McMahon by Lynott for an undivided one thirty-second interest, the consideration named being $100. Denny's connection with the venture was not known to the other copromoters until this litigation was commenced. Huson gathered tonnage data and arranged a kind of prospectus for the project, and in 1917 and 1918 the possibilities along the projected line of the railway were investigated by him. What is known as the "Marion Lake Project" and other projects were controlled under applications for state rights by Portland parties and a considerable sum of money had been invested by them in this connection. An option covering these rights was obtained by Huson in the interest of the railroad project and he became trustee for whatever rights in such water-power could be acquired under the option.

Federal legislation regulating capital investments prevented the furtherance of the project until the close of the World War. In the spring of 1919, defendant Barron, at Munly's request, suggested the revival of the project. Soon afterwards Barron visited the City of New York and other eastern points. One R. S. Ryan of New York, acting for eastern parties to whom the project was presented through the efforts of Barron, suggested that surveys across the Cascade Mountains and certain priority rights of way over government lands be thus acquired as a preliminary to the participation of his parties in the promotion of the project. Ryan also requested that steps be taken for renewal of expiring rights of way and obtaining additional rights of way and municipal franchises.

On May 24, 1919, the defendant Portland and Southeastern Railway Company was incorporated under the laws of the State of Oregon, capitalized at $2,000,000, divided into 20,000 shares of the par value of $100 each. The plaintiffs Huson, S. C. Spencer and J. W. Foster acted as incorporators. Up to this time the title to all the rights of way, surveys, franchises and other property and assets which had been acquired for the benefit of the project, with the exception of the option in the water-power project held by Huson, was held in the name of defendant McMahon as trustee. On May 27, 1919, subscriptions to the capital stock of the Railway Company were received and by mutual agreement Lynott subscribed for 10,000 shares of the stock, the par value of which was $1,000,000. This sub scription was made by him as trustee for himself and for all the other parties interested in the project and property in proportion to their respective inter-

ests, to be held by him. It was the intention of all
the parties that Lynott should convey to the Railway Company all of the property that had been acquired for the project in full payment for his stock
subscription. The other directors besides Lynott,
subscribed for one share to entitle them to act as
directors. The incorporation and organization of
the Railway Company were without the consent of
Barron and over the protest of defendant Munly.

At the first stockholders' meeting held on May
27, 1919, Lynott, Huson, Watson, Barron, McMahon,
Spencer and W. B. Meredith were elected directors.
At that meeting the manner of the payment by Lynott
of his subscription came up and Huson submitted to
the stockholders a written statement over his signature which is in evidence, to the effect that all of
the property and assets then belonging to the
project were of the reasonable value of $1,000,000
*for railroad purposes.* Thereupon, based upon such
statement, a resolution was unanimously adopted
agreeing to accept from Lynott a conveyance of all
of the property and assets in full payment of his subscription for 10,000 shares of stock. At a meeting
of the board of directors of the Railway Company
held immediately following the adjournment of the
stockholders' meeting a resolution was adopted ratifying and approving the foregoing action taken at the
stockholders' meeting. All of the parties who were
interested in the project including plaintiff Huson
either knew about and consented to Lynott's subscription to such stock and to the manner in which it
was paid for, or else subsequently ratified the same.

On the date of the organization of the Railway
Company a written contract for an undivided one
thirty-second interest in the project was delivered to

plaintiff Huson by Lynott on behalf of McMahon, trustee, for a nominal consideration of $100. The plaintiff alleges that this contract was given for the purpose of enabling him to act as a director of the company and was not intended to be a settlement of his rights in the project; and that Huson relied upon Lynott to adjust the matter later when the stock of the Railway Company was distributed to the associates. This contract, as Lynott claims, was in consideration of Huson continuing with him and helping him further develop the project.

At a meeting in Barron's office in the Yeon Building in Portland, Oregon, about the middle of June, 1919, Barron, who had recently returned from the east, reported to the promoters the results of his negotiations with Ryan. There were present at the meeting the plaintiffs Lynott, Barron, Munly, Watson and Spencer. Lynott represented his relatives, McMahon and the Merediths, nonresidents, and Spencer acted as attorney for the Lynott group. Robert Munly, one of the witnesses and attorneys in this case, was also present. All present seemed to think that the success of the project which had languished so long was then in view. The plan suggested by Ryan was in detail: (1) Covering by surveys approximately forty to sixty miles of government lands between Niagara in Linn County, and Bend in Crook County. (2) Securing priority rights of way by such surveys under the federal statutes, and especially through Hogg's or Minto Pass, and other strategic points in the Cascade Mountains. (3) Further rights of way between Mount Angel and Niagara on the western end, as well as additional municipal franchises along the entire line. Other meetings were held to devise means for acquiring

surveys over the government lands and to obtain such further rights of way and franchises as might be necessary to meet the ideas of Mr. Ryan.

Ryan estimated that $100,000 additional would be required for surveying, etc., and about $1,000,000 more for grading, before the project reached the bonding state. Barron was induced by all the parties to supply the means for surveys of the government lands. The Myler Construction Company was thereupon organized by Barron and associates for the express purpose of making such surveys and to acquire such additional rights of way and franchises for the Railway Company. Mr. Barron held the stock control and was the president. M. G. Munly was vice-president and his son, Robert N. Munly, was secretary and treasurer of the company.

On June 26, 1919, three separate contracts were entered into by the Railway Company with the Construction Company. The first of these contracts made provision for doing thirty miles of surveys across government lands through Hogg's or Minto Pass in the Cascade Mountains as requested by Ryan. For such services the Construction Company was to receive under this contract known as the survey contract, "an undivided one eighth of the project as a whole, to be represented by 2,500 shares of the capital stock fully paid and non-assessable."

The second contract provided means for renewing rights of way and franchises in Marion and Linn Counties. This contract gave an option to the Construction Company to make further surveys, obtain further rights of way and franchises, and to do construction work when the project was advanced far enough for its purpose. The Construction Company agreed to advance to the Railway Company $2,500

to be distributed in renewing and extending the rights of way contracts. In consideration thereof the Construction Company was to receive among other things the following: (1) The exclusive and sole right and option to finance or sell the railway project or to make any arrangements that would be advantageous to, and approved by the stockholders of the Railway Company or their trustees under such pooling arrangement as might be entered into regarding the further capitalization of the Railway Company; and the Railway Company agreed to sell and convey all of its assets to any purchaser which the Construction Company might produce during such option period, for a sum equal to "thirty cents (30¢) of the par value" of said 10,000 shares for which Lynott had subscribed, namely, the sum of $300,000. (2) The full powers of supervision and control over the future development and expansion of the railroad project and the right to formulate and control the policy to be pursued in connection with the project during the life of the agreement. (3) The exclusive right to obtain all future rights of way for such railroad between Mount Angel and Bend, and to receive $10 in paid up and nonassessable stock of the Railway Company for every dollar thus expended, or which it might expend in excess of the sum of $2,500, in securing the renewal or extension of the rights of way contracts expiring on July 1, 1919. (4) The first right and opportunity to contract for the surveying or construction of the whole or any part of said railroad line to Bend. This contract further provided that the Railway Company should secure the consent of a majority of the stockholders of the Railway Company to enter into a pooling agreement whereby all earned stock of the Railway Company

should be pooled and held in trust to protect the Construction Company in its option.

The third contract between the two corporations provided among other things as follows: (1) The Construction Company agreed to advance the sums necessary to pay the Railway Company's office expenses and wages of such necessary office help as the same came due, until January 1, 1920, up to $190 per month, also $500 to cover the attorney's fee of S. C. Spencer, attorney for the Railway Company, for which the Construction Company was to receive $10 in fully paid up and nonassessable stock of the Railway Company for every dollar so expended.

As a part of the same transaction some of the parties interested in the 10,000 shares of stock, to wit: Michael Lynott, E. P. McMahon, Isabella Meredith, James T. Barron, H. S. Huson, J. E. Chisholm and J. F. Watson, on June 26, 1919, executed a certain pooling agreement in writing, dated as of that day, under the provisions of which all of the parties transferred to James T. Barron, Michael Lynott and H. S. Huson, as trustees, all of their interest in 10,000 shares of stock for which Lynott had subscribed, and which he held as trustee, *"in trust, until January 1, 1920."* The purpose of this agreement was to pool all of the stock to protect the Myler Construction Company in its above-mentioned three contracts with the Railway Company. These three trustees had a right to vote, to sell all of the assets of the Railway Company, for a sum equivalent to not less than 30 per cent of the par value of the stock held as above mentioned.

In order to secure the Myler Construction Company for its expenditures under the first contract 2,500 shares of the capital stock were deposited in

escrow in the Hibernia Savings Bank to be delivered
to it upon the filing of a certificate of plaintiff Huson
as engineer that the maps had been completed.   Huson
was appointed as general engineer of the Myler Con-
struction Company and the surveys made by that
company were made under his direction.   Lynott
was engaged by the Construction Company to renew
the rights of way and franchises, and was to be
paid for such services $10 per day out of the $2,500
to be contributed for this purpose or out of any ad-
ditional funds provided for under the ten to one
arrangement.

Prior to the time of the execution of the three
contracts mentioned the Construction Company,
through its attorneys and agents, made an inde-
pendent investigation of the affairs of the Railway
Company and of the property and assets owned by it,
and knew of the manner of payment of the
$1,000,000 stock subscription of Lynott.

Soon after the resolution of the stockholders' meet-
ing was adopted authorizing the payment of the
$1,000,000 stock subscription of Lynott by the trans-
fer to it of all of the property and assets which
were held in trust by McMahon, a bill of sale, which
was also in the form of a quitclaim deed, was pre-
pared for the purpose of being signed by all of the
interested parties to make a transfer of the title to
such property to the Railway Company.   This bill
of sale was signed by McMahon, as trustee, and also
in his individual capacity, and by Isabella Meredith
and her husband, by Lynott and wife, by Huson and
wife, by Watson and wife and by J. F. Chisholm.
There was some delay in getting the bill of sale
around to the different parties for their signatures,
and it was some time before it was presented to the

defendant Barron for his signature. He refused to sign it on the grounds hereinafter referred to. This bill of sale set out the names of the parties who had an interest in the railway project and the amount of interest of each as follows: E. P. McMahon, eight thirty seconds; Isabella Meredith, two thirty seconds; James T. Barron, four thirty seconds; J. Frank Watson, two thirty seconds; J. F. Chisholm, one thirty second; H. S. Huson, one thirty second; and M. Lynott, fourteen thirty seconds. No reference was made to the interest of the defendant Denny or that of defendant Munly.

After the execution of the three contracts and the pooling agreement the Myler Construction Company proceeded under its contracts, and made location surveys of the thirty mile section, renewed several of the rights of way contracts and paid the Railway Company office expenses.

Plaintiff and his allies complain and assert that at the first meeting of the parties at Mr. Baron's office after his return from New York, Lynott made a statement that he had acquired forty-one miles "with some gaps" of rights of way. The right of way contracts, at the time of the execution of the contracts mentioned, were in the possession of Lynott and were not delivered to the Myler Construction Company until about two weeks after such contracts were executed.

All of the contributions to the project up to the time the Myler Construction Company became interested were received by Lynott. After the Myler Construction Company completed the surveys, the work of preparing the maps, profiles, etc., from the surveys made under the first contract was proceeded with at the office of the defendant Railway Company. All

of the assets that had been acquired for the project by the Myler Construction Company, except surveys which had not been platted, had been taken over by the Railway Company. The Construction Company expended $16,152.59 in making such surveys under the first contract, $2,111.23 in making further surveys under its option contract and $7,732.73 under its second and third contracts, making a total of $25,996.55.

Plaintiff and his allies complain that Lynott misrepresented the number of miles of rights of way and number of franchises and assets that he had obtained for the project and the amounts that had been invested for the purpose of the project by Lynott and his relatives; that after the Myler Construction Company was organized a total sum of $5,536.38 had been placed in Lynott's hands by the Myler Construction Company for the renewal and acquirements of rights of way and franchises; and that after this litigation started it was found that only 7.9 miles of rights of way and two franchises were actually secured by him for the Railway Company.

Until about the time of the incorporation of the defendant Railway Company the project was known as "Lynott's Railway Project" and appears to have been so treated by all of the parties. Lynott sold off interests in the project from the unsold portion whenever he chose, and at whatever price he saw fit. This was practically with the knowledge and acquiescence of the cross-appellants.

About September, Ryan came out from New York and made a personal inspection of the railroad project. He was much pleased with it, and said it was much better than it had been represented to him. However, he insisted that before he would attempt to

finance it in the east the interested parties would have to disincorporate the Railway Company and then incorporate a holding corporation, and each party take an amount of the stock of the new company according to the amount of money or the value of the services he or she had contributed to the project. He confirmed his former estimate that it would require at least $100,000 to complete further necessary surveys and acquire necessary rights of way and $1,000,000 more to be put into actual construction before the line could be brought to the bonding stage.

At a meeting of the parties with Ryan for consultation and negotiations, Lynott informed Ryan that the Railway Company was bound by the three contracts with the Myler Construction Company, one of which gave the construction company an option until January 1, 1920, to purchase the Railway Company's property for a sum equivalent to $300,000; that all the parties interested were bound by the pooling agreement regarding their stock interests; and that all he or the Railway Company could do was to live up to the contracts and pooling agreement. The statement of Lynott was construed as a demand for $300,000 before any further negotiations with Ryan could be made. Lynott claims that neither the Myler Construction Company nor the plaintiff or his allies made any suggestion or offer to modify any of the above agreements so that Ryan's demands could be met. The result was that Ryan returned home without anything further being done.

From this time on there was contention between the two camps. Lynott asserts that the Myler Construction Company, through Huson, who had acted as its agent in making the surveys under contracts, then

began surreptitiously to remove from the Railway Company's office the maps and profiles, etc., of the surveys it had made. On October 16, 1919, it notified the Railway Company that it would not make delivery to the Railway Company of the plats and field-notes of the surveys on the ground; that it had discovered the 10,000 shares for which Lynott had subscribed and which had been issued to him and 2,500 shares of which had been placed in escrow for it with the Hibernia Savings Bank, had never been paid up, and it therefore refused to accept such stock; that it would advance no more money under any of the contracts for the same reason, and demanded that the Railway Company return to it all moneys advanced by it under the contracts with legal interest.

Thereafter the Railway Company demanded of the Construction Company the delivery to it of the maps, plats, profiles and field-notes in accordance with the provisions of their contracts. Upon the refusal of the Construction Company to do so, the Railway Company, through Lynott, instituted a replevin action against it to recover possession of such property.

Plaintiff Huson then caused this suit to be instituted. The lower court issued a restraining order, which among other things, restrained the Railway Company from further prosecuting the replevin action and the Railway Company and its officers from accepting the bill of sale which conveyed the assets to the Railway Company as payment in full for Lynott's million dollar stock subscription. The court also entered an order appointing receivers for the Railway Company.

Separate answers to the plaintiff's complaint, which are in the nature of complaints and raise no material issues upon the allegations of the complaint, except in regard to the amount of the contribution to the project by respondents J. F. Chisholm, E. P. McMahon and Isabella Meredith, were filed by defendants, Myler Construction Company, James T. Barron, M. G. Munly and J. F. Watson. A joint answer was filed by defendants, Portland and Southeastern Railway Company, Michael Lynott, S. C. Spencer, J. F. Quirk and J. F. Chisholm, to which plaintiff filed replies. Defendants McMahon, Isabella Meredith and W. B. Meredith, are nonresidents, and service of summons and complaint was made upon them by publication. A special motion to quash was overruled, but those defendants refused to answer and a default for failure to answer was taken against them. The pleadings and testimony in this case are voluminous, and the issues are many and complex.

The major issues in this case arise upon the joint answer of appellants and respondent Chisholm to the plaintiff's complaint, upon plaintiff's reply to the same, upon the joint answers or cross-pleadings of the Portland and Southeastern Railway Company to the affirmative answers designated by the pleaders as replies, and upon the several replications thereto of the cross-appellants herein.

The trial court appointed receivers to care for the property of the project during the litigation and issued temporary restraining orders. It further decreed that plaintiff Huson and defendant Munly were each entitled to an undivided one-eighth interest in the project, the defendant Denny an undivided one thirty-second interest. Defendant Munly was awarded

a money judgment of $1,058, and defendant Watson $1,020.50. It found that the Myler Construction Company had fully performed all its contracts and awarded to that company an undivided one-eighth interest in the project, but gave it only 1,250 shares of stock instead of 2,500 shares as provided in its first or survey contract. It awarded the Construction Company 734 shares for moneys advanced under its second and third contracts under the ten to one arrangement. The decree awarded to defendant Mc-Mahon an undivided one-fourth interest, to defendant Isabella Meredith an undivided one-sixteenth interest, to defendant J. F. Chisholm an undivided one thirty-second interest, and to Michael Lynott an undivided three-sixteenths interest in the project. The claims of defendant Baron for an undivided one-eighth interest and defendant Watson for an undivided one-sixteenth interest were uncontested. The court, after deducting 1,984 shares awarded to the Construction Company, divided the balance of 8,016 shares among the several parties according to their interest as mentioned above.

The decree also enjoined W. J. Quirk from further acting on the board of directors, and provided for other matters.

J. F. Chisholm, one of the joint answering defendants, did not appeal. The defendants, Portland and Southeastern Railway Company, Michael Lynott, S. C. Spencer and W. J. Quirk appeal from the whole of the decree, especially from the awards to plaintiff Huson, defendant Munly and defendant Denny. The plaintiff Huson and the defendants, Myler Construction Company, Barron, Munly, Watson and Denny, filed cross-appeals from the whole decree.

Modified.

For appellants there was a brief over the names of *Mr. Frederick M. De Neffe* and *Mr. Jay Bowerman*, with an oral argument by *Mr. De Neffe.*

For cross-appellant H. C. Huson, there was a brief and oral argument by *Mr. James P. Stapleton.*

For cross-appellant J. F. Watson, there was a brief over the name of *Messrs. Wood, Montague & Matthiessen*, with an oral argument by *Mr. Richard W. Montague.*

For cross-appellants Myler Construction Co. and James T. Barron, there was a brief over the names of *Mr. W. A. Munly, Mr. I. N. Smith, Mr. M. G. Munly* and *Mr. Robert N. Munly*, with oral arguments by *Mr. W. A. Munly* and *Mr. Smith.*

For cross-appellant M. G. Munly, there was a brief over the names of *Mr. W. A. Munly, Mr. I. N. Smith*, and *Mr. Robert N. Munly*, with oral arguments by *Mr. W. A. Munly* and *Mr. Smith.*

For cross-appellant E. C. Denny, there was a brief over the names of *Mr. W. A. Munly, Mr. Virgil H. Massey, Mr. M. G. Munly*, and *Mr. R. N. Munly*, with an oral argument by *Mr. W. A. Munly.*

BEAN, J.—Appellants contend in substance: (1) That plaintiff's complaint does not state a cause of suit, and the evidence does not prove a cause of suit. (2) That Lynott at no time promised to give Huson or Munly an interest in the project. (3) That such alleged parol promises are within the statute of frauds. (4) That the court had no power or jurisdiction to decree that a stockholders' meeting of the

Railway Company be held. (5) That the court had no power under the law and the evidence, to decree that the written contract which Lynott gave to Denny, was an absolute conveyance to Denny of a one thirty-second interest in the project.

1. It should be stated at the outset that the answers of the cross-appellants asking for affirmative relief are in the nature of complaints. The matters alleged herein and the relief sought are only such as a court of equity can take cognizance. It is apparent from the replevin action that was commenced for possession of a few maps, etc., that an action at law would not provide adequate remedy. The interests of the parties in the "project" as it is called and in the certificates of stock in the Portland and Southeastern Railway Company issued to represent the same, which are in dispute, and the settlement of the compensation and interests of the Myler Construction Company under its contracts and the preservation of the right of all parties concerned, are such that a court of equity only has authority to settle and determine. There was no demurrer filed to the complaint. Where a court of law and a court of equity have concurrent jurisdiction, if the plaintiff resorts to equity, the objection that he has an adequate remedy at law is waived by answering over to the merits: *Maxwell* v. *Frazier,* 52 Or. 183 (96 Pac. 548, 18 L. R. A. (N. S.) 102); *McDowell* v. *Carothers,* 75 Or. 126 (146 Pac. 800). It would require a multitude of law actions to settle the various disputes between the parties.

2. It is proper for several defendants to cross-plead with each other and relief may be obtained by one defendant against another: *Hough* v. *Porter,* 51 Or. 318, 375, 376 (95 Pac. 732, 98 Pac. 1083, 102

Pac. 728); *Knighton* v. *Chamberlin*, 84 Or. 153, 159 (164 Pac. 703); Pomeroy's Code Remedies (3 ed.), § 808.

3. The case was tried in the Circuit Court upon the issues arising upon the allegations in the complaint and the cross-pleadings of the several defendants, and not upon the theory that it was a suit to enforce specific performance of an oral contract relating to land. The plaintiff did not sue on behalf of the Portland and Southeastern Railway Company. The Railway Company was made a party defendant because it brought a replevin action against the Myler Construction Company, which injuriously affected the interests of all the associates in the enterprise. It was necessary to bring in all the associates in the undertaking as new parties to the litigation in order to avoid a multiplicity of suits: *Alderman* v. *Tillamook Co.*, 50 Or. 48 (91 Pac. 298). The issues in this suit, in the main, are between the projectors in the railway enterprise concerning their respective interests in the project. The railroad undertaking or project, up to the time of the incorporation of the Railway Company, was in the nature of a joint adventure. It appears to be settled by the weight of authority that an enterprise in the nature of a co-partnership which has for its purpose the purchase, improvement and sale of real estate for the profit arising therefrom, to be divided among the joint adventurers, as among partners, and which does not undertake to operate upon the ownership and title to the realty, is not within the operation of the statute of frauds: *Knott* v. *Knott*, 6 Or. 142; *Flower* v. *Barnekoff*, 20 Or. 132 (25 Pac. 370, 11 L. R. A. 149); *Maguire* v. *Kiesel*, 86 Conn. 453 (85 Atl. 689, 691; 23 Cyc. 454; *Smith* v. *Imhoff*, 89 Wash. 418 (154

Pac. 793); *King* v. *Barnes,* 109 N. Y. 267 (16 N. E. 332); *Chester* v. *Dickerson,* 54 N. Y. 1 (13 Am. Dec. 550); *Bates* v. *Babcock,* 95 Cal. 479 (30 Pac. 605, 29 Am. St. Rep. 133, 16 L. R. A. 745); *Eaton* v. *Graham,* 104 Ill. App. 296.

4. The matters involved in this suit are those over which a court of equity has complete jurisdiction. The defendant Lynott cannot, after the contracts in dispute have been executed and the benefits thereof realized, be heard to say that the contracts are void under the statutes of frauds: *Coward* v. *Clanton,* 79 Cal. 23 (21 Pac. 539).

5. The statute of frauds should not be made an instrument of fraud: *McDaniels* v. *Harrington,* 80 Or. 628, 632 (157 Pac. 1068); *Cooper* v. *Thomason,* 30 Or. 161, 175 (45 Pac. 295).

It was understood and agreed by the parties that Lynott should subscribe for 10,000 shares of the capital stock to represent the different interests in the project owned by the several promoters, most of which were held in the name of E. P. McMahon as trustee for the promoters. In payment for the shares of stock all of the assets and property belonging to the railway project including the water-power project, which were estimated by H. S. Huson, chief engineer for the project, in writing, to be of the reasonable value of $1,000,000 "for railroad purposes," were to be turned over to the Railway Company. Based upon the statement of Huson, Lynott stated to the directors of the company at a meeting held May 27th, that such assets and property were of the reasonable value of $1,000,000 for the purposes of the company, and it was agreed that the same be turned over to the Railway Company in payment for the 10,000 shares of the capital stock of the com-

pany, fully paid up and nonassessable, which he had theretofore subscribed for. The directors by resolution duly accepted the proposal and property, and directed that the company issue to Lynott the 10,000 shares fully paid up when he should turn over and convey to the company the foregoing property.

Up to this time the business of the railway enterprise had been transacted by Lynott during the first stages and afterwards by him and the other promoters. At this juncture the corporation commenced to transact its business as such organization.

It was agreed that 10,000 shares of the capital stock of the par value of $1,000,000 subscribed for by Lynott, should be distributed among the respective parties in proportion to their interests theretofore held in the project. For example, Barron, who owned an undivided one-eighth interest in the project under the arrangement, was entitled to one eighth of the stock subscribed, which was one half of the whole amount of capital stock, making Barron's portion 1,250 shares.

We now have for consideration the transaction between the Railway Company and the Myler Construction Company. Soon after the organization of the Railway Company, and on June 26, 1919, three contracts were regularly entered into between the Portland and Southeastern Railway Company and the Myler Construction Company for the purpose of carrying out the project for a line of railway from Mount Angel, Marion County, Oregon, to Bend, Crook County, Oregon. The purport of these contracts is set forth in the statement above.

By reference to the first, or survey contract, which was carefully prepared and duly executed, the Myler

Construction Company as payment for making the thirty miles of survey and the maps, profiles, etc., in connection therewith was to receive "one-eighth interest in such railway project as a whole." This one-eighth interest is further described thus: "To be represented by one eighth of the entire capital stock of the corporation, to wit, twenty-five hundred (2500) shares of the par value of one hundred ($100.00) dollars each, fully paid up and nonassessable." It is clear from this contract that under such provision the Myler Construction Company upon completion and certification of the work which was accomplished was entitled to 2,500 shares "fully paid up and nonassessable" of the Railway Company. While it was provided that these 2,500 shares should in the first instance be taken from the 10,000 shares subscribed for by Lynott, it was plainly provided in the pooling agreement (paragraph five) that,

"whenever any of said stock is withdrawn, and turned over, and reissued, to said Myler Construction Company, that he, the said M. Lynott, upon the written request of a majority of said trustees, shall subscribe for an additional and equivalent amount of stock of the Railway Company, and shall forthwith transfer or cause the same to be transferred and reissued, to said trustees so that there shall always be the same amount of stock in this pool, and so that the total stock held under this pooling agreement shall remain intact and never be diminished during the life of the same, it being the intention and purpose to reimburse the undersigned shareholders for all the stock surrendered to Myler Construction Company under the terms of this pooling arrangement."

Reference to these contracts shows the amount of capital stock to be distributed to the parties interested, other than the Myler Construction Company, and makes it clear that this stock of the Myler Con-

struction Company was finally in effect to be taken from the second half of the capital stock of the Railway Company.

The Myler Construction Company, after the completion of the survey and the failure of the promoters to obtain the assistance of Mr. Ryan, to finance the railway system on October 16, 1919, notified the Railway Company and now claims

"that this stock, which has been placed in escrow to be delivered to it upon the completion of the surveys, has in fact never been paid up, either in whole or in part, and that at this time the Board of Directors of the Railway Company are contemplating the acceptance of a transfer of certain property, which is for the most part worthless and absolutely of no value, in payment of this stock."

The Construction Company claims that Lynott misrepresented the value of the property turned over to the Railway Company in payment for the 10,000 shares of stock. At the stockholders' meeting held May 27, 1919, a resolution was adopted authorizing the payment by Lynott of his subscription for 10,000 shares of stock by his conveying to the corporation the property required for the project. Doubtless a speculative value was placed thereon and the figures are large. At this meeting of the stockholders Lynott, Huson, Watson and Spencer were present. They were confronted with a problem of completing the organization of the corporation. Spencer was then attorney for the corporation, and informed them that one half of the stock would have to be subscribed for then, and that it would be legal for the Railway Company to accept this property in payment for Lynott's subscription. Huson testified that "for railroad purposes" this property in his opinion

was reasonably worth $1,000,000. All of the water-power interests which he had acquired were also to be transferred to the Railway Company as part payment for the subscription.

A careful reading of the voluminous testimony and record in the case convinces us that the proof shows that the findings of the trial court that plaintiff Huson and defendant Munly were each entitled to a one-eighth interest in the project, and one eighth of the 10,000 shares of capital stock subscribed for by Lynott, are right and equitable. To state the matter briefly, Mr. Lynott was a railroad contractor and entered upon the project of promoting a railroad first from Salem to Stayton. He afterwards interested plaintiff Huson who, as conceded by all, is an expert railroad engineer, to act as chief engineer of the project and agreed to give him a one-eighth interest therein. Huson performed the services and in addition thereto was instrumental in connecting up with the railroad scheme, the Marion Lake water-power project. The water-power proposition greatly enhanced the whole project. While the option on the water-power project was at first held in Huson's name, and afterwards the filing for the same with the state engineer was in Huson's name, it is conceded by him that it was all for the benefit of the project.

The testimony indicates that it was Judge Munly's idea of changing the proposed line of the railroad so as to begin near Mount Angel and run to Stayton and thus connect with Portland by means of other lines instead of beginning at Salem. It appears that he was instrumental in interesting J. T. Barron in the enterprise. Barron contributed large sums of

money to further the project. Munly also contributed $1,080 to further the scheme.

It is claimed by Lynott and his associates that Huson and Munly are estopped from claiming an eighth interest, for the reason that the "bill of sale" executed by E. P. McMahon as trustee and the pooling agreement did not specify such interests. Huson objected to the bill of sale for that reason. That document recites:

"Whereas it was understood that the said M. Lynott, upon the receipt of said million dollars worth of stock, so subscribed for, as aforesaid, should divide the same up between the parties herein in proportion to their holdings, as hereinabove set out, *subject to any* existing contracts and agreements."

The object of the bill of sale as the writing shows was to provide a means of perfecting the organization of the railway corporation. The quoted portion indicates that the division of the shares of stock should be "subject to any existing contracts and agreement." The pooling agreement mentioned "the undersigned shareholders of the Railway Company" without specifying the number of shares of stock held by each. It was not signed by Denny or Munly. These memorandums answer the purposes for which they were intended, but do not estop Huson, Munly or Denny from asserting their rights to their respective interests.

6. While Lynott was the main promoter, and practically the sole promoter at the inception of the project, in equity, he did not own the surveys, profiles, etc., which were produced by the services and money of Munly and Huson. The water-power project is held in the name of Huson as much as the railroad project was formerly in Lynott's name. Lynott

through McMahon, trustee, could assign his interest in the concern, but not the interest of the others without their consent. The shares of stock were subscribed for by Lynott to be held in trust for all of the interested parties, and the part paid for by the interests, services or money of Munly and Huson belongs in equity to them. Otherwise the project would be disintegrated.

"Where property is purchased as a joint venture, it is not material in whose name the title is taken, as any one holding the title will be regarded as trustee for his associates; and properly paid for out of the receipts of the joint adventure becomes the joint property of all the parties." 23 Cyc. 455.

We think the testimony shows that Lynott's contract to Denny represented an absolute sale of a thirty-second interest in the project, and that the proposition of repayment of the amount contributed by him was a subsequent deal. We fail to see the materiality of the contention that it was a loan until there is an offer to redeem. Denny says he is willing to take the money.

7. It appears from the testimony that all of the stockholders and directors of the Railway Company in fixing the value of the property which the corporation was accepting in payment for one half of its stock, were acting in good faith. There was no actual fraud in the transaction. Under these circumstances the judgment of the stockholders and directors as to the value of the property was conclusive as to everyone who participated in and had knowledge of the transaction, and who did not dissent from the action taken: Section 6872, Or. L.; *Farrell* v. *Davis,* 85 Or. 213, 221 (161 Pac. 94, 713);

4 Thompson on Corporations (2 ed.), §§ 3988, 3904 and 3909. The latter section reads in part thus:

"The general rule is that a corporation which issues its stock as paid up, which is not so in fact, and does this with the consent of all the stockholders, cannot afterwards compel the holders of such stock to pay the difference between the par value of the stock and what has been paid or agreed upon as full payment, * * *"

Section 3910 of the same volume reads:

"In other words, stockholders who participate in the issuance of stock at less than par value and give their consent thereto are estopped to question the legality of the transaction."

In the instant case the corporation had no creditors. All of the interested parties understood in regard to the assets and property the Railway Company was accepting as well, or better, than Lynott. All of them were attempting to boom the project to the best of their ability. Quite likely the figures should be scaled down. That is a matter for the parties, and not for the court.

Much space in the brief of cross-appellants is devoted to the conduct of Lynott in promoting the project, and the claim is made that by his fraudulent conduct he has in equity forfeited all of his rights in the enterprise. For some time he was pioneering the project in a rather crude way. No books or accounts were kept. He was not a bookkeeper. He endeavored to interest parties along the proposed line by giving a banquet and spending some money. Whether this was wise or not, we do not look upon the testimony as showing fraud in this respect. He seemed to treat the project as his own. Much complaint is made of Lynott's action at the meeting held

with Ryan of New York, and it is argued that Lynott blocked the financing of the scheme. The second, or option contract, together with the pooling agreement, practically placed the policy of the Railway Company project in the hands of the Myler Construction Company. The option contract reads in part:

"Said Railway Company further covenants, stipulates and agrees that said Construction Company shall have the sole and exclusive right and option to finance or sell said railway project or to make any arrangements that would be advantageous to and approved by the stockholders or their trustees under such pooling arrangement as may be entered, regarding the further capitalization of the Railway Company; but the said Railway Company stipulates, covenants and agrees to transfer and convey its property and holdings upon any offer to purchase the same obtained through or by the agency of the said Construction Company, for a sum equivalent to thirty cents (30¢) of the par value of the stock held by the stockholders whose names are affixed to such pooling agreement, and that said option shall remain in full force and effect until the first day of January, 1920. * *

"Said railway company further covenants, stipulates and agrees that said Construction Company shall, except as hereinabove provided, have full powers of supervision and control over the future development and expansion of said projected railroad line and enterprise, and the right to formulate and control the policy to be pursued in connection therewith and to decide all questions regarding such policy that may arise during the life of this agreement."

Lynott testified on this point, that Watson, Spencer and Huson were at the meeting with Ryan and himself, and then as follows:

"I said, * * 'We have got a contract with the Myler Construction Company, and we are hog tied,

and we can't break it * * .   We are going to live up to the contract.' "

Lynott further testified that Spencer and Watson told Ryan the contract provided for $300,000; that he never demanded $300,000 for himself; that he wanted it for the Railway Company; that Huson figured what he would get out of it; and that he said, "We must live up to the contract." Spencer testified as follows:

"Lynott said very little, but * * that the pooling agreement called for thirty cents on the dollar on the million shares, and that is all he would do. * * I think I did say to him (Ryan) the thirty cents on the dollar came from the other side; that it didn't come from our side, and that I thought that he had always known it; and he said he had not heard of it before he got out here."

It does not appear that the Myler Construction Company, or anyone, proposed to waive or change the terms of the contracts so as to meet the requirements of Ryan. The option was then in force. The Railway Company could not agree to sell its property to two different parties. Whether the financing scheme with Ryan would under any circumstances have been carried out the failure should not all be laid to Lynott. He is entitled to his legal share of the stock. The rights of the several parties are based upon contracts.

After a careful consideration of the record we conclude that the decree of the lower court, as to the ownership of the shares of stock in the Railway Company, should be modified so as to declare that the following parties are the owners of fully paid and nonassesable shares of stock of the Portland and Southeastern Railway Company, and are entitled to

have such shares issued to them in the following amounts, to wit:

| Name. | No. of Shares. | Par Value. |
| --- | --- | --- |
| Michael Lynott | 1875 | $187,500 |
| H. S. Huson | 1250 | 125,000 |
| J. T. Barron | 1250 | 125,000 |
| M. G. Munly | 1250 | 125,000 |
| J. F. Watson | 625 | 62,500 |
| E. C. Denny | 312.5 | 31,250 |
| E. P. McMahon | 2500 | 250,000 |
| Mrs. Isabella Meredith | 625 | 62,500 |
| J. E. Chisholm | 312.5 | 31,250 |
| Myler Construction Company | 2500 } 3234 | 323,400 |
| Myler Construction Company | 734 } | |
| S. C. Spencer | 1 | 100 |
| J. F. Watson | 1 | 100 |
| J. F. Quirk | 1 | 100 |
| J. W. Foster | 1 | 100 |

8. The decree of the trial court should be further modified so that J. F. Quirk, one of the directors of the Railway Company should not be restrained from acting as such, but allowed to act until his successor is regularly elected and qualified. It appears that Quirk was regularly elected as a director, and we find no good cause shown why he should practically be removed; and that any meeting of the stockholders for the purpose of electing directors should be called and held in accordance with the constitution and by-laws of the corporation and not by an order of the court. 2 Cook on Corporations (7 ed.), § 593, pp. 1744–45, reads: "Courts have no power to call corporate meetings except by mandamus." In *Beard* v. *Beard,* 66 Or. 512, 521 (133 Pac. 797, 134 Pac. 1196), and *In re Vinton,* 65 Or. 422 (132 Pac. 1165), it was

held that a proceeding in *mandamus* is a proceeding at law.

It appears that in the pleadings and the brief both defendant Munly and defendant Watson base their claim for shares of stock and interest in the project upon the amounts of money contributed thereto by them. Therefore, we conclude that they are not entitled to a money judgment against the Railway Company. It was not understood or agreed that the corporation should be responsible for any part of the money contributed by Munly or Watson.

9. Mr. Watson alleges in paragraph ten of his second amended answer, that on February 1, 1919, he contributed $1,800 and afterwards contributed $420 more, and is entitled to one-sixteenth interest. These were transactions between the promoters. The general rule obtains at law that corporations cannot be bound by acts done or promises made in their behalf before they came into existence. Until organized a corporation has no being, franchises, or faculties. Its promoters, or those engaged in bringing it into being, are in no sense identical with the corporation, nor do they represent it in any relation of agency, and they have no authority to enter into preliminary contracts binding the corporation, unless so authorized by the charter: 7 R. C. L., p. 80, § 59; *Rockford, R. I. etc. Co.* v. *Sage,* 65 Ill. 328 (16 Am. Rep. 587); *Weatherford etc. Ry. Co.* v. *Granger,* 86 Tex. 350 (24 S. W. 795, 40 Am. St. Rep. 837); *Davis & Rankin Bldg. & Mfg. Co.* v. *Hillsboro Creamery Co.,* 10 Ind. App. 42 (37 N. E. 549).

10. In order for the corporation to be liable for these contributions it must have been understood and agreed by all parties concerned that the corpora-

tion should be so liable: 1 Thompson on Corporations (2 ed.), § 92.

In order to preserve the property of the corporation it was competent for the trial court to appoint receivers to care for and protect the same during the litigation.

The controversies between the parties having been adjusted in this suit as far as possible, the action in replevin should be perpetually enjoined.

The decree of the lower court will be modified in accordance herewith. Each party will pay his own costs upon this appeal. The costs in the lower court will be paid as therein decreed.    Modified.

Mr. Justice McCourt did not participate in the consideration of this case.

---

Former decree modified and rehearing denied March 13, 1923.

ON PETITION FOR REHEARING.

(213 Pac. 408.)

Rehearing Denied.

BEAN, J.—By a petition for a rehearing our attention is called to the necessity for further details in regard to the transfer to the Portland and Southeastern Railway Company of the property, consisting of right of way contracts, maps and plats of surveys, and all the assets acquired for the railway project. As shown by the record, the property was formerly held by E. P. McMahon as trustee. A document in the nature of a quitclaim deed and bill of sale, which is designated in the record as a "bill of sale" was executed by E. P. McMahon as trustee, and

as beneficiary, but was not signed by all of the beneficiaries. In our former opinion we treated this as having been executed, for the reason that it ought to have been completed.

In order to perfect the corporate records of the Portland and Southeastern Railway Company, and to complete the transfer of the property in question the "bill of sale" should be signed by plaintiff H. S. Huson and by defendants James T. Barron, J. F. Watson, M. G. Munly and E. C. Denny, and all of the beneficiaries for whom E. P. McMahon as trustee held such property in trust, or in case of the decease of any of such parties, then the same should be signed by their heirs, legatees, executors, administrators or assigns. This should be done before the stock awarded to such parties is delivered to them as provided in our former opinion.

As soon as the officers of the Portland and Southeastern Railway are duly elected and qualified, all of the assets and property mentioned in the opinion herein shall be delivered to, and accepted by the Portland and Southeastern Railway Company. The order of the lower court enjoining the officers of the corporation from accepting the bill of sale, or property mentioned, should be dissolved.

It should be noted that this court does not find the property involved herein to be of the value of a million dollars, or any other sum. We do not pass upon the value of such property, and only use the estimated value of shares of stock, in apportioning the interests of the respective parties.

In order to serve the purpose of the replevin action, further proceedings in which were restrained by the trial court, the Circuit Court is hereby authorized and directed, in case of any necessity therefor, to hear

and determine any matters of dispute in regard to the transfer of the possession of the property and assets held by the receivers, or any party to this suit, and to make any and all necessary orders and decrees to carry into effect the opinion and decree of this court herein, not inconsistent with the same, to the end that all of such property and assets may be transferred, and in order that all matters in controversy herein may be fully settled and determined in this suit.

After careful consideration of the other portions of the petition for rehearing relating to the award of shares of stock to the several parties, we adhere to our former opinion in regard thereto.

FORMER DECREE MODIFIED AND REHEARING DENIED. Motion to Recall MANDATE DENIED WITH SUPPLEMENTAL ORDER.