Argued March 28; affirmed July 2, 1946

# DEVEREAUX *v.* COCKERLINE ET AL.

(170 P. (2d) 727)

L. G. Lewelling, Judge.

*Mark V. Weatherford,* of Albany (with W. L. Marks and Weatherford & Thompson, of Albany, on brief), for appellant.

*Winsor W. Calkins,* of Eugene (Calkins & Calkins on brief), for respondents.

Before ROSSMAN, Acting Chief Justice, and BAILEY, LUSK, BRAND and HAY, Justices.

LUSK, J.

This is an appeal by the plaintiff from an adverse decree in a suit for an accounting and other relief.

The controversy arises out of a contract alleged to have been entered into in the year 1924 by the plaintiff with A. T. Cockerline and Mary E. Cockerline, his wife, both now deceased, who were the parents of the defendants. The alleged contract relates to an investment in timber land in Linn County, the Cockerlines providing the purchase price of the land and the plaintiff contributing certain services. Plaintiff at the time was a licensed real estate broker, but ceased to be such after the year 1924. He claims, however, that under the arrangement with the Cockerlines he did not act in the capacity of a broker, but as a partner. The validity of that claim is the controlling question in the case.

The agreement sued upon is in writing and reads:
"AGREEMENT
"THIS AGREEMENT, ENTERED INTO IN DUPLICATE, this 4th day of August, 1924, by and between A. T. Cockerline and Mary E. Cockerline, First Parties, and C. P. Devereaux, second party;
"WITNESSETH: That for and in consideration of the sum of ONE DOLLAR, and other valuable considerations, the parties of the first part hereby appoints the party of the second part his general timber broker, to buy and sell for him on his behalf, timber and timber lands in general, and

to specify tracts as may be set out herein by consent of the parties, and may be inserted and may be as follows, to-wit:

"The Northeast quarter of Section TWENTY TWO, in Township Fourteen South of Range ONE East, Willamette Meridian, Linn County, Oregon. Containing 160 acres more or less.

"IT IS UNDERSTOOD AND AGREED, by and between the parties hereto that said timber lands are bought for investment purposes and held for the profit, and the party of the first part hereby agrees to furnish all necessary funds to purchase such timber and timber lands. Such first party also agrees to pay to second party, his heirs and assigns, as a commission for his services and experience in being able to locate profitable investments, one half of the net profits realized upon buying said timber and timber lands, and said party of the first part shall receive, over and above the original investment, one half of the net profits. Said net profits on each sale shall be determined as follows, to-wit:

"After deducting from the gross proceeds of each sale the original investment, (the original investment on the above described lands being $2,036.86, which includes full payment of 1923 tax) together with eight per cent per annum on said original investment, from the time said investment is made until said sale shall have been made, and the remaining amount shall be the net proceeds of said sale.

"IT IS FURTHER UNDERSTOOD AND AGREED, by and between parties hereto, that the first parties shall pay all taxes that may accrue against said timber and timber lands from the time they are purchased until they are disposed of. Said taxes shall be a part of the original investment, and the party of the second part shall pay all expenses incidental and necessary in the selling and disposing of said timber lands, except however if it

shall be necessary to pay a commission to other parties for the sale of said timber, that the commission shall be deducted from the net profits before said profits are divided between first and second parties hereto.

"The said second party shall use his best efforts to make and procure a profitable sale of each and every tract of timber and timber lands bought and sold.

"IN WITNESS WHEREOF, We have hereunto set our hands and seals to this and other instruments of the same date and tenor on the day and date first above written.

"A. T. COCKERLINE (SEAL)
C. P. DEVEREAUX (SEAL)
(SEAL)

"IN THE PRESENCE OF
A. E. WHEELER

"State of Oregon, County of Lane,

"On this the 4th day of August, 1924, personally came before me a Notary Public, in and for said County and State, the within named A. T. Cockerline and Mary E. Cockerline and C. P. Devereaux, to me personally known to be the identical persons described in and who executed the foregoing instrument, freely and voluntarily for the uses and purposes herein named.

Witness my hand and Notarial Seal, this 18th day of August, 1924.

"W. E. WHEELER
NOTARY PUBLIC FOR OREGON

"My Notarial Commission expires May 27, 1927.

"(NOTARIAL SEAL)"

The agreement was signed by the plaintiff and Mr. Cockerline, but not by Mrs. Cockerline.

The amended complaint upon which the case was tried, after setting forth a number of timber trans-

actions between plaintiff and the Cockerlines prior to the one in suit, alleged "that thereafter and pursuant to an agreement hereinafter set forth, and the performance thereof, the plaintiff located and recommended to the Cockerlines for purchase, the following described timber land (the description is the same as in the contract). And that pursuant to said agreement the said Cockerlines provided the purchase price thereof in the amount of $2,036.86 and the land was conveyed pursuant to said agreement from Ida E. Willcutt to the said A. T. Cockerline and Mary E. Cockerline on the 29th day of July, 1924 * * *".

It is next alleged:

"That thereafter said Cockerlines and the said plaintiff made a written memorandum of the said partnership agreement, which is in words and figures as follows (a copy of the agreement is then set forth)."

It is further alleged:

"That thereafter and during the lifetime of each of the said Cockerlines, each thereof and the plaintiff herein acknowledged said agreement and kept the same in full force and effect and that the defendant herein had full knowledge of said agreement and recognized the same."

It is alleged that A. T. Cockerline died testate on the 25th day of November, 1932, and left surviving him as his heirs at law his widow, Mary E. Cockerline, and three children, the defendants Harold B. Cockerlin, Kenneth W. Cockerline and Winifred M. Barker, and that he willed and bequeathed all his property to his widow, and his estate was closed on July 15, 1933; that Mary E. Cockerline died testate July 13, 1939; that the defendants were her sole heirs at law; and that she

devised and bequeathed all her estate to the defendants, share and share alike, and her estate was closed on May 1, 1940; that the timber land involved was not sold during the lifetime of either of the Cockerlines; that it came into the possession of the defendants after the death of Mrs. Cockerline and was sold by them on January 17, 1940, to Santiam Logging Company for a consideration in excess of $16,000.00; and that plaintiff made demand upon the defendants for an accounting of the profits derived from such sale, but that they have not complied with such demand. The prayer demands an accounting of such profits and ''a judgment and a decree against the defendants in such proportion as each defendant has received the said funds from the sale of said land and from said estate for the amount determined in said accounting, together with interest, etc.''

The defendants, in separate but identical answers, admitted the execution by A. T. Cockerline, but not by Mrs. Cockerline, of the agreement sued on, and the sale of the timber land sometime between January and March of 1940, and alleged affirmatively that the plaintiff's claim was barred because the estates of A. T. Cockerline and Mary E. Cockerline had been duly closed; that the contract was abandoned by the plaintiff; that the agreement of A. T. Cockerline to pay a commission to the plaintiff did not survive his death; and that the alleged agreement of Mary E. Cockerline is not in writing and subscribed by her, and therefore is void under Subd. 8 of § 2-909, O. C. L. A.

LUSK, J.

■■ As stated, the controlling question is whether the contract is one of partnership or real estate brokerage. If the former, it was valid against both Mr. and

Mrs. Cockerline if both were parties to it, even though not in writing, for it is the law in this state that a valid contract of partnership for the purpose of speculating in real estate may be made by parol. *Page-Dressler Co. v. Meader,* 118 Or. 359, 367, 244 P. 308; *Huson v. Portland & Southeastern Ry. Co.,* 107 Or. 187, 208, 211 P. 897, 213 P. 408; *Flower v. Barnekoff,* 20 Or. 132, 138, 25 P. 370, 11 L. R. A. 149. If the latter, it was within the statute of frauds and not binding on Mrs. Cockerline, who did not sign it, or on her heirs. § 2-909, (8), O. C. L. A. If, moreover, it was a brokerage contract, the plaintiff, whose broker's license expired at the end of the year 1924 and was never renewed, was thereafter disabled from performing any services under it, for, during the entire period from 1925 to 1940 when the land was sold, it was unlawful for any person "to engage in the business or act in the capacity of real estate broker within this state without first obtaining a license therefor." Ch. 223, § 5, General Laws of Oregon, 1921. This provision was made more comprehensive by later enactments, and the present law, passed in 1939, provides that it shall be unlawful for any person "to engage in or carry on or to advertise or hold himself * * * out * * * as engaging in or carrying on the business, or act in the capacity of, a real estate broker" without a license. § 59-301, O. C. L. A. And, since the plaintiff was not "a duly licensed real estate broker at the time the alleged cause of action arose", in 1940, he was prohibited by the statute from maintaining an action for the collection of compensation under such a contract. Ch. 423, § 30, General Laws of Oregon, 1929; § 59-312, O. C. L. A.; *Hunter v. Cunning,* 176 Or. 250, 154 P. (2d) 562.

The foregoing discussion assumes, though it does not decide, that, if the agreement is one of partnership, its effect was to invest the plaintiff with part ownership of the property. If he was an owner, he did not come within the definition of a real estate broker, so far as the transaction in question is concerned, under any of the statutes in effect during the period with which the case is concerned. Ch. 223, § 4, General Laws of Oregon, 1921; Ch. 277, § 4, General Laws of Oregon, 1925; Ch. 423, § 9, General Laws of Oregon, 1929; Ch. 81, Oregon Laws, Second Special Session, 1933; § 59-104, O. C. L. A. These observations are prompted by some doubts as to the scope of the decision in *Flower v. Barnekoff,* supra, on which the plaintiff relies. That case did not deal with a real estate broker's statute, and, hence, may not be a controlling authority where the requirement of a broker's license is in issue. For present purposes, however, we may assume that it is.

In any event, whatever the character of the agreement, we do not see how it is possible to hold the defendants on the theory advanced by counsel for the plaintiff that their father became indebted to the plaintiff and that they received through their mother property that had been part of the estate of their father, A. T. Cockerline, exceeding in value the amount of plaintiff's claim. It is unnecessary in this connection to discuss the effect of §§ 9-708 and 9-709, O. C. L. A., relating to suits against heirs and devisees for the debts of a decedent (see *First National Bank v. Connolly,* 172 Or. 434, 485, 138 P. (2d) 613, 143 P. (2d) 243), nor to decide whether the claim is barred because it was not presented to the executor of the estate of A. T. Cockerline, although it may be observed that the stat-

ute expressly provides that if the claim ''be contingent, it shall nevertheless be presented as any other claim.'' § 19-702, O. C. L. A.

■ Irrespective of these questions, it seems to us clear that there was never anything owing to the plaintiff from A. T. Cockerline because he did not breach the agreement, and the contingency which would have made him liable to the plaintiff for a share of the profits never arose. The land was taken and held by the Cockerlines as tenants by the entirety, a fact known to the plaintiff, who witnessed the deed. On A. T. Cockerline's death his widow, as the surviving spouse, owned the entire estate by virtue of the title originally vested. A. T. Cockerline did not breach the agreement, because the land was not sold in his lifetime. And the agreement died with him since the subject-matter of it, the land, became wholly vested in his widow, not as an heir, but by right of survivorship. If there be any right of recovery against the defendants it could be only because they took the land burdened with the obligation to carry out a contract made by their mother from whom they acquired title under her will.

We have to consider, then, the construction and effect of the agreement and whether Mrs. Cockerline ever became a party to it. The agreement was not executed until after the timber land had been purchased and conveyed to the Cockerlines. The evidence shows that the owner of the land first talked to Mr. Devereaux, the plaintiff, about selling it, and he reported the matter to the Cockerlines. At their request he inspected the timber and obtained a cruise of it, and, upon his recommendation, they decided to buy the property. A few days after the deed was executed, the plaintiff and Mr. and Mrs. Cockerline went to the office of an

attorney in Eugene, who drafted the agreement. Why it was not signed by Mrs. Cockerline does not appear. It purports to be acknowledged by all three of the parties, but the acknowledgment is defective.

It is not a well drawn instrument, as even a casual reading discloses. It recites that it is between A. T. Cockerline and Mary E. Cockerline, first parties, and C. P. Devereaux, second party, and that in consideration of $1.00 and other valuable considerations "the parties of the first part hereby appoints the party of the second part *his* general timber broker, to buy and sell for *him* on *his* behalf, timber and timber lands in general". (Italics added.) We think that this means that the parties of the first part, the Cockerlines, appoint Devereaux *their* general timber broker to buy and sell for *them* on *their* behalf, etc. If read literally it does not make sense. The next phrase, "and to specify tracts as may be set out herein by consent of the parties, and may be inserted and may be as follows, to-wit" is baffling in its obscurity. (We are quoting from the contract as pleaded; the instrument itself, which is in evidence, shows that, instead of "specify", the word is spelled "specifif".) We may hazard the guess that it was intended to convey some such meaning as, "and in particular such specific tracts as may be herein inserted by agreement of the parties." But, whether that be correct or not, we think is not very material, for no other tract than the one described is involved. The description of the land comes next and is followed by a provision that the lands are to be held for investment purposes and for profit; that the parties of the first part shall furnish the purchase price, and that they agree "to pay to second party, his heirs and assigns, as a commission

for his services and experience in being able to locate profitable investments, one half of the net profits realized *upon buying* said timber and timber lands, and said party of the first part shall receive, over and above the original investment, one half of the net profits.'' (Italics added.) It is argued by the plaintiff that the use of the phrase ''upon buying'' in this clause indicates that plaintiff had earned his commission when the contract was written. That might be so but for two things. One is that no profits were or could possibly be realized until the lands were sold, and the other is the provision later in the contract that ''the second party shall use his best efforts to make and secure a profitable sale of each and every tract of timber and timber lands bought and sold.'' The phrase ''profits realized upon buying said timber and timber lands'' is another example of ineptness in draftsmanship. It is not appropriate to convey the obvious meaning, namely, that the plaintiff was to be paid a commission of one-half of the net profits that might be realized from a sale of the land. Standing alone, the phrase ''as a commission for his services and experience in being able to locate profitable investments'' gives some color to the plaintiff's contention. But the instrument must be read by its four corners, and the plaintiff's agreement therein to use his best efforts to make a profitable sale may not be ignored. The net profit to be divided is next defined as the difference between the gross proceeds of the sale and the original investment, including taxes to be paid by the Cockerlines, with interest at the rate of eight per cent per annum thereon. It is agreed that Devereaux shall ''pay all expenses incidental and necessary in the selling and disposing of said timber

lands, except however if it shall be necessary to pay a commission to other parties for the sale of said timber, that the commission shall be deducted from the net profits before said profits are divided between first and second parties hereto.''

In *Flower v. Barnekoff*, supra, (20 Or. 143) this court said:

"A partnership is usually defined to be a voluntary contract between two or more competent persons to place their money, effects, labor and skill or some or all of them in lawful commerce or business, with the understanding that there shall be communion of the profits and losses thereof between them. (Story on Part. § 2; 3 Kent, 23.)''

The court further said that the intention of the parties governs; that such an intention will be determined from the effect of the whole contract regardless of special expressions; and that "a community of profit and loss in the adventure or business in which the parties are engaged is usually considered a test of partnership''. It was said at p. 144:

"Profits may be, and in fact often are, received as mere compensation in case of service or special agency where the employe has no interest in the business or power as a member of the firm and no interest in the profits, as such, but is employed as a servant, special agent or broker, and is to receive a given proportion of the profits as compensation for his services. In such case the receipt of profits does not constitute a partnership.''

The weight of authority seems to be that the presumption arising from a profit sharing agreement is rebutted by a mere showing that the only consideration for the agreement was the rendition of services. 137 A. L. R. 15, and cases cited at p. 16.

A joint adventure, as the court said in *Elliot v. Murphy Timber Co.*, 117 Or. 387, 394, 244 P. 91, 48 A. L. R. 1043, is analogous to but not identical with a partnership. The following from Schouler on Personal Property (5th ed.), § 167a, was quoted with approval:

"This name seems to be applied to those special combinations of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation. All such persons are partners or *quasi* partners, rather than joint or common owners; * * * with essentially the rights and disabilities which pertain to the partnership relation, although less comprehensive or permanent in the scope intended."

See, *McKee v. Capitol Dairies*, 164 Or. 1, 5, 99 P. (2d) 1013.

■ It is probably the law that an agreement, express or implied, to share losses is not essential to a joint adventure, especially in cases where one party furnishes money and the other services. 30 Am. Jur., Joint Adventures, 694, § 33; *Elliott v. Murphy Timber Co.,* supra. But see *Gottlieb Bros. v. Culbertson's,* 152 Wash. 205, 277 P. 447, and annotation, 63 A. L. R. 911. "In general, however, where the parties agree to participate in the profits and to bear the losses jointly, they are regarded as joint adventurers, if their relationship is not that of partnership." 30 Am. Jur., op. cit., 683, § 12. See cases cited in 48 A. L. R. 105.

■ In the contract now under consideration there is no express agreement to share losses, and we think that none is implied. This conclusion is based on the general nature of the arrangement between the parties, and also on their situation. The plaintiff had at one time been a prosperous dealer in timber, but had suf-

fered adversity. He and Mr. Cockerline, who was a man of some substance, had been friends for years and had engaged in a number of similar transactions, and we think it improbable that it was contemplated by either of them that, if a loss should be sustained as a result of the investment, Devereaux would be under any obligation to share it. This, however, is not conclusive of the question.

There is an agreement to share profits, and this may be indicative of the intention to create a partnership. But, as Mr. Justice ROBERT S. BEAN pointed out in *Flower v. Barnekoff*, supra, profits may be mere compensation, paid to one who is not a member of the firm and has no interest in the profits as such, but who is employed as a servant, special agent or broker, and is to receive a given proportion of the profits as compensation for his services. So we must look to the circumstances and to other provisions of the contract to determine the character in which the plaintiff was to receive a share of the profits. When we do so we find that the Cockerlines were people with money to invest; that Devereaux was a licensed real estate broker; that they appointed him their general timber broker to buy and sell timber and timber lands for them, particularly the lands described in the contract; that the compensation to be paid him is designated a commission; that he agrees to use his best efforts to make a profitable sale, and to bear the expense necessary and incidental to such a sale, except the payment of a commission to other parties where that should become necessary.

We have already referred to the contention of counsel for the plaintiff that the compensation to be paid him was solely for ''his services and experience in

being able to locate profitable investments''. In our opinion, that phrase cannot be permitted to prevail over all the other provisions of the contract which point to the engagement of the plaintiff's services as a broker, nor can it have the effect of eliminating from the contract the plaintiff's agreement to use his best efforts to make a profitable sale of the lands. This provision harmonizes with the preamble of the contract appointing Devereaux the Cockerline's broker to buy and sell this particular tract of timber lands for them, and makes clear the understanding of the parties that, notwithstanding the specific language on which counsel relies, the agreed compensation was to be paid for something besides the plaintiff's "services and experience in being able to locate profitable investments". And the use of the word "pay" is strong evidence that whatever plaintiff should receive as his share of the profits was compensation. *Shebley v. Quatman,* 66 Or. 441, 447, 134 P. 68.

For decisions involving analogous agreements and holding them to be contracts of employment, not partnership, see annotation, 137 A. L. R. 125-127.

Plaintiff cites a number of cases in support of his position. One is *Flower v. Barnekoff,* supra. It bears some points of resemblance to the instant case, but the agreement there was to share losses, as well as profits, a fact which the court stressed in stating its conclusions. (20 Or. 145.) The contract there was oral, and there was evidence, which the court accepted, that the defendant had admitted in the presence of the plaintiff that they were partners in the transaction.

*Elliot v. Murphy Timber Co.,* supra, had to do with a contract between a timber company and the manager of one of its logging operations. On its facts, it has

little similarity to the instant case, save that there was a provision for sharing profits. Moreover, the court held that the plaintiff, suing on the contract, was entitled to an accounting by virtue of his agreement, irrespective of whether it evidenced a joint adventure.

*Stoop v. United States National Bank,* 119 Or. 645, 250 P. 760, cited by the plaintiff, is distinguishable for the reason, among others, that there was an express agreement to share losses.

The plaintiff also cites cases in which the court held that a real estate broker's license law did not apply to one who had acquired an option on the land with which he dealt. *Tufts v. Mann,* 116 Cal. App. 170, 2 P. (2d) 500; *Robinson v. Easton, Eldridge & Co.,* 93 Cal. 80, 28 P. 796, 27 Am. St. Rep. 167. The following quotation from the opinion in the latter case will serve to illustrate the difference between them and the instant case:

> "The plaintiffs, in effect, gave to the defendant an option for five days to endeavor to sell the block of land for whatever sum it could obtain, and upon whatever terms it might make, provided they should receive therefor the sum of $10,000, and agreed that defendant should have whatever sum it could realize therefor above that amount. The relation thus created between them was rather that of a vendor and purchaser under a contract of sale than one of principal and agent, and a sale by the defendant thereunder was in the capacity of a vendor upon its own account, and not for the account of the plaintiffs."

Nor is *McSherry v. Market Corporation,* 129 Cal. App. 330, 18 P. (2d) 776, in point. In that case one of the two owners of all the capital stock of a corporation sued the corporation for compensation for procuring

leases. The services were rendered before the corporation was organized and the corporation assumed them, and it was held, in those circumstances, the corporation being but an instrumentality to carry out the enterprise, that the stockholders were joint adventurers and the plaintiff an owner and, hence, not within the real estate broker's statute.

In *Rattray v. W. P. Brown & Sons Lumber Co.*, 29 Ala. App. 93, 192 So. 285, one employed to locate bodies of timber and report the same to the lumber company was held not to be a broker within the meaning of the Alabama statute, which is like ours.

"There was no obligation", the court said, "resting upon the defendant to buy this timber and no remuneration or compensation would be due to the plaintiff from the defendant, unless and until by negotiations between the defendant and the owners of the property the timber had been bought at a price satisfactory to the defendant."

The court quoted the definition of a broker as given in Webster's New Standard Dictionary: "One who for a commission or fee, brings parties together and assists in negotiating contracts between them," which, it was said, is generally accepted by all the authorities. The duties undertaken by the plaintiff went beyond those involved in the Rattrary case. They included bringing parties together and assisting in negotiating contracts between them. The plaintiff actually brought together the Cockerlines and the owner of the land in question here, and, according to his own testimony, assisted in selling the timber in 1940.

*Strumpf v. State*, 31 Ala. App. 409, 18 So. (2d) 104, merely applies the provisions of a real estate

broker's statute which exempted from its operation regular employees of a corporation who engage in buying and selling property owned by the corporation. *Sherman v. Clear View Orchard Co.*, 74 Or. 240, 145 P. 264, is a somewhat similar decision.

In our opinion none of the cases cited by plaintiff controls the decision here.

■ Plaintiff argues that the "instrument creates a trust, provides for the administration of the trust, and designates the parties who shall control the trust." If this be so, it did not bind Mrs. Cockerline. It is not a resulting or constructive trust, and as an express trust, in order to be valid as to Mrs. Cockerline, the instrument must have been signed by her. § 2-905, O. C. L. A.

It is further contended that the evidence shows that the parties construed the contract as one of partnership. Carl Oglesby, a timber cruiser whom Cockerline at one time employed to cruise the timber, testified as follows about a conversation with the latter in 1928 or 1929:

> "Where I got the information—who told me— I do not know, but I was given the impression that Mr. Devereaux had a working interest in it. What that interest was I did not know or did not ask. It was none of my business, but I was given the impression he was interested in that piece of timber."

Otto Briggs, a lumberman, testified that in 1932 Cockerline told him that Devereaux "had an interest in it; he didn't say how much."

There is evidence that Mrs. Cockerline on several different occasions made the statement that Devereaux "was interested in the property". One witness swore she told him in 1929 that Devereaux was a partner, but,

on cross-examination, admitted that he based his testimony on a suggestion made to him by someone that it was a partnership.

The only agreement in question is that contained in the writing, and Mrs. Cockerline's construction of it is not relevant unless she was a party to it. The complaint alleges that Mrs. Cockerline "acknowledged said agreement and kept the same in full force and effect". If this is intended as an allegation that she adopted it—which would be a somewhat liberal construction—she could not have done so except by signing it, if it was in fact a brokerage contract. That question must first be determined before her declarations could be considered. As for the statements attributed to Cockerline, they are consistent with the view that it was a brokerage contract, for he may have meant no more than that Devereaux had an interest in the sense that he was entitled to receive a commission in the event of a sale.

The plaintiff himself offered evidence which sheds some light on the relation of the parties. This evidence relates to a different property than the one in controversy, but it is pertinent because the plaintiff testified that all these timber deals with the Cockerlines were under agreement similar to the one under consideration. The plaintiff testified that Otto Briggs sought of Mrs. Cockerline (Mr. Cockerline being dead) a timber cutting contract on this property on terms which he specified, and Mrs. Cockerline said that she would be willing with Mr. Devereaux' consent. Mrs. Cockerline then said she wanted someone to supervise the cutting for her and asked Devereaux if he would do so. He agreed and was paid five per cent of the proceeds of the contract for his services, which amount

was charged by Mrs. Cockerline as part of the first cost of the timber. Testifying on the same subject, Otto Briggs said that Mrs. Cockerline told him, "Now, Mr. Devereaux will be my agent and look after all the cutting, anything that comes up from now on".

This testimony does not depict the attitude of joint adventurers on the part either of the plaintiff or Mrs. Cockerline, but rather that Mrs. Cockerline considered herself the owner and that Devereaux recognized her as such.

■ As the authorities show, the question in a case of this kind is one of intention. It would scarcely be possible to find two cases exactly alike in all their relevant circumstances, and each case, therefore, must be determined on its own facts by an application of the general principles to which reference has been made earlier in this opinion. As the foregoing discussion indicates, it is our judgment that the parties intended, in entering into the agreement sued upon, the payment to the plaintiff of a share of the profits of the transaction, not as profits, but as a commission for services, which included acts performed and to be performed by him as a real estate broker. An agreement of that character to be valid and enforceable must be signed by the party to be charged, and, as Mrs. Cockerline did not sign it, it was not binding on her or on her heirs, and the circuit court, therefore, was right in dismissing the suit.

The decree is affirmed.