Argued January 28, affirmed April 19, 1972

TERRY, *Respondent, v.* SIMMONS, *Appellant.*

496 P2d 11

Gerald R. Pullen, Portland, argued the cause for appellant. With him on the brief was Robert E. Perrin.

Leo Levenson, Portland, argued the cause for respondent. With him on the brief were Richard Maizels and Francis E. Harrington.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE,* HOLMAN, TONGUE, and HOWELL, Justices.

McALLISTER, J.

This is a suit in equity in which plaintiff alleges that a parcel of real property in Portland belongs to plaintiff and defendant as partners and that defendant has wrongfully claimed the property as his own. The trial court found that the property belonged to the partnership and defendant has appealed. We review the evidence de novo.

Plaintiff and defendant were Portland business men who met socially about 1960 at the YMCA where they thereafter frequently played handball together.

---

* Denecke, J., did not participate in the decision of this case.

In his complaint in this case the plaintiff alleged that in 1965 he and the defendant agreed to become equal partners in buying parcels of real property as investments. It is clear that such a partnership was formed and that its first venture was the investigation of the possibility of purchasing a gambling casino in Jackpot, Nevada. The casino was not purchased, but certain expenses were incurred in investigating the proposal, which were paid by the partners.

In 1966 the partnership purchased for about $30,000 the Wolfard Building in Oregon City, which was occupied by an automobile dealership. Plaintiff had heard about the property and interested defendant in purchasing it. Defendant paid the down payment of about $3,000 and took a note from plaintiff for his share, which note was later paid out of income from the property.

Thereafter, in May 1967, the parties bought the telephone building in Lake Oswego for $30,000. There is no evidence of the financial details of this transaction.

Later in 1967 the partnership purchased the Medical Science Building in Portland for a price of $300,000. Again, it was the plaintiff who learned that the property was available and told defendant about it. The defendant furnished the down payment of $30,000 and again plaintiff gave defendant a note for his half of that amount.

After they bought the Medical Science Building the parties opened a joint checking account on which either could write checks. Income from the Medical Science Building and the Lake Oswego building was deposited in this account. A separate account was

maintained for the Oregon City property, which had only a single tenant and limited expenses.

All of the above properties were still owned by the partnership at the time of the trial in this case. The parties had no written agreements—except for the notes given by plaintiff to defendant, their agreements and financial arrangements were entirely oral.

The subject of this case is a piece of property at 14th and Glisan Streets owned by the City of Portland on which was situated a service station and an unused fire station. Defendant was a gasoline distributor and since 1962 had leased the service station from the city. Late in 1967 defendant learned that the city was planning to sell the property and so informed plaintiff. Plaintiff and defendant inspected the property together and agreed that it would be a good investment for the partnership and that they would try to buy it.

Defendant admitted that he and plaintiff agreed to buy the property. He testified

"When Mr. Smith advised me that the City was going to place this on the surplus market, I discussed this with Mr. Terry. I told Mr. Terry this would be a valuable piece of property to have for future use with the Freeway system developing, and that if he was interested in that property, in owning it, and owning it together on joint partners, that I would be glad to go down and try to buy it.

"After looking and examining the property, he indicated he was of that mind. We went on on that basis. * * *"

Pursuant to his agreement that he would try to buy the property, defendant deposited with the city purchasing agent the sum of $500 in cash as a good

faith deposit required of all bidders. The receipt for this payment is dated January 16, 1968, and carries the following notation: "Earnest money deposit for purchase of property at N.W. 14th & Glisan for 75,000.00".

The property was sold at public auction on February 16, 1968. According to the defendant he was the only bidder at the auction and, in any event, he bought the property for the minimum price of $75,000. On April 30, 1968, the defendant paid the balance of a $7,500 down payment and executed a land sale contract, agreeing to pay the rest of the purchase price in five annual installments.

As indicated by his quoted testimony, the defendant had agreed to "try to buy" the property for the partnership. The reasons why he wanted to handle the purchase himself are not clearly disclosed by the record. He had been leasing a part of the property from the city for about six years. His brother was the city purchasing agent who handled "the mechanics of getting out the bid forms and one thing and another" and, as the trial court noted in its findings, "plaintiff's name was anathema to Portland city officials." In any event, defendant not only bought the property, but bought it in his own name.

Although the exact date is indefinite, both parties agree that it was several months after the property was purchased before defendant told plaintiff that defendant considered himself the sole owner of the property and that plaintiff had no interest therein. In the meantime, plaintiff had publicly claimed to be a co-owner of the property, negotiated with a temporary tenant, directed the construction of a curb along the property, and visited the property a number of times.

He had a key to the firehouse which defendant had furnished him.

Defendant's alleged right to purchase the property for himself and to exclude plaintiff from any interest therein was based solely on plaintiff's failure to pay defendant his share of the $500 good faith deposit required to bid on the property. He testified that on several occasions he asked plaintiff for plaintiff's share of this deposit and that plaintiff on each occasion said that he did not have the cash or a blank check with him, that plaintiff neglected to put up his share of the deposit and that defendant finally "dropped" the matter. Defendant's testimony is fairly well summed up in the following quotation:

"Q When Mr. Terry told you he did not have a check with him, did he say anything further about his desire to participate in the purchase?

"A No, he did not.

"Q Do I understand then that the total basis upon which you went forward and took the property in your own name, and what happened was the fact he did not have with him on February 16 or February 15, or at that time, a check for $250.00?

"A Mr. Terry at that time, when I asked him again for the second or third time whether he was interested in proceeding with the purchase of this property, or was willing and able to come up with his share of the money, at that time he did not come up with the money, or would not come up with the money.

"He said he was sorry he hadn't gotten the check for it, and so I did not pursue it any further. I did not go any further with it, Mr. Harrington."

Defendant also testified that at that time there was about ten or twelve thousand dollars in the partnership Medical Science Building account and that there

was no reason by either he or plaintiff could not have written a check for $250 on that account. He testified:

"A   We were both on the account.

"Q   Would there have been any reason why you could not have had a check drawn for $250.00, drawn on that?

"A   No.

"Q   Was there any reason Mr. Terry could not have had a check drawn for $250.00 on that account?

"A   No."

■ The trial court found that the parties had agreed to buy the property as partners, and that prepayment by plaintiff of his half of the down payment was not a condition precedent to the creation or continuation of the partnership. The trial judge's reasons for this conclusion, as stated in his memorandum opinion, are:

"1. In the past the defendant alone had financed the property ventures of the parties. Nothing was initially said or done to suggest they would necessarily proceed on a different basis in this instance.

"2. The defendant did not advise plaintiff that he claimed sole ownership of the Glisan Street property until September or October, 1968. During that four or five month period the plaintiff, with defendant's knowledge, publicly claimed joint ownership and privately did many things in respect to the property consistent with joint ownership and inconsistent with sole ownership by the defendant. I cannot believe defendant would have tolerated such claims or actions by his then friend and business associate had they not been justified in fact."

We concur with the trial judge's conclusion about the facts. We need not speculate when or why defendant decided to exclude his partner and claim the property for himself. We simply do not believe defendant's story that he purchased the property for himself because

plaintiff neglected to advance the comparatively insignificant sum of $250 before defendant submitted his bid at the auction sale on February 16, 1968. Defendant had no right to purchase for himself without obtaining plaintiff's consent or by giving him unequivocal notice that unless plaintiff's share of the money were furnished, defendant would consider himself free to proceed on his own account. *Bradbury v. Nagelhus*, 132 Mont 417, 319 P2d 503 (1957). In any event, the weight of the evidence convinces us that when he bid on the property, defendant was acting for the partnership.

Defendant argues that if there was an agreement it was unenforceable under the statute of frauds as an agreement purporting to create an interest in real property.[1] He relies on the general rule, as stated in 49 Am Jur 544-545, Statute of Frauds §§ 218-219, that an oral contract between two or more persons to purchase real estate for their joint benefit falls within the statute of frauds, as does an agreement that one party is to purchase property and then convey an interest to the other. *Huffstutter v. Lind*, 250 Or 295,

---

[1] ORS 93.020:

"(1) No estate or interest in real property, other than a lease for term not exceeding one year, nor any trust or power concerning such property, can be created, transferred or declared otherwise than by operation of law or by a conveyance or other instrument in writing, subscribed by the party creating, transferring or declaring it, or by his lawful agent under written authority, and executed with such formalities as are required by law.

"(2) This section does not affect the power of a testator in the disposition of his real property by a last will and testament, nor to prevent a trust from arising or being extinguished by implication or operation of law, nor to affect the power of a court to compel the specific performance of an agreement in relation to such property."

300, 442 P2d 227 (1968); *Dennis v. City of McMinnville,* 128 Or 101, 106, 269 P 221 (1928).

Plaintiff relies on the rule, recognized in a number of Oregon cases, that an agreement to form a partnership for the purpose of dealing in land may be oral, and that such an agreement is not within the statute of frauds. That rule was adopted in *Flower v. Barnekoff,* 20 Or 132, 25 P 370, 11 LRA 149 (1890), a suit for dissolution of a partnership and for an accounting. The alleged partnership agreement was oral, and the purpose of the partnership was to buy, subdivide, and sell as lots a certain tract of land. Title was taken in defendant's name, and at the time of the suit he had sold it at a profit. Defendant argued that if there was an oral partnership agreement to deal in real estate it was unenforceable under the statute of frauds. The court's opinion acknowledged and examined a split of authority on this question and adopted the rule that "a valid contract of partnership for the purpose of speculating in real estate may be made by parol." 20 Or at 138. The decision in *Flower* is limited to the situation before the court in that case:

> "* * * Many of the cases above cited go much further than is necessary for us to go in this case in order to admit the proof of the formation of the partnership here. *The contract does not in any way affect the title to real estate, nor does the present controversy involve any such question.* The subject matter of the contract was the profits to be realized from the sale of the Tucker land, and the controversy here is as to such profits. *The contract of purchase from Tucker was not secured to hold as land or with any intention of ultimately vesting the legal title in the partnership, but for the purpose of sale and the acquisition of profits.* It was secured simply as an article of commerce and for speculation. No controversy exists here about the

title to any land taken or owned by the partners, but it simply relates to the conduct of the defendant while he was acting as a partner; and in such a case the statute of frauds certainly cannot be invoked to defeat this suit. * * *" 20 Or at 138. (Italics added.)

*Huson v. Portland & Southeastern Ry. Co.,* 107 Or 187, 211 P 897, 213 P 408 (1923) involved the rather complex affairs of a railroad building project. In its early stages the enterprise was engaged in obtaining rights of way, and during this period various persons were granted fractional rights in the project. It was contended that oral promises to convey such interests were within the statute of frauds; the court held them enforceable, saying:

"* * * The railroad undertaking or project, up to the time of the incorporation of the Railway Company, was in the nature of a joint adventure. It appears to be settled by the weight of authority that an enterprise in the nature of a copartnership which has for its purpose the purchase, improvement and sale of real estate for the profit arising therefrom, to be divided among the joint adventurers, as among partners, and which does not undertake to operate upon the ownership and title to the realty, is not within the operation of the statute of frauds: * * *." 107 Or at 208.

At the time of the suit the project's assets had been conveyed to the corporation; the fractional shares in suit were awarded in the form of shares in the corporation.

*Page-Dressler Co. v. Meader,* 118 Or 359, 244 P 308 (1926) involved an alleged oral agreement between plaintiff company and Meader that they should form a partnership for the purpose of acquiring and operating an apartment house, and that title

should be in Meader who would manage the business for the partnership. Meader later sold the property, and the company sued for a dissolution of the partnership and for an accounting. This court refused to enforce the alleged partnership agreement because plaintiff did not come into equity with clean hands; however, it first considered defendant's contention that the statute of frauds applied:

"Defendant contends that the alleged partnership contract was for the purchase and sale of real property, and not being in writing, was within the statute of frauds, and therefore void. This contention is foreclosed by the decision of this court, in *Flower v. Barnekoff*, 20 Or 132, where it was in effect held that a valid contract of partnership for the purpose of speculating in real property may be entered into by parol; that in such case, the contract of partnership is not a contract for the purchase or sale of real property, or of an interest therein by one partner to the other, and hence is not within the meaning of the statute nor in conflict with it. That decision, and numerous others, holding to the same effect, the last of which is Huson v. Portland etc. Co., 107 Or 187, 208 (211 Pac. 897, 213 Pac. 408), are controlling upon this question." 118 Or at 366-367.

Again in *Devereaux v. Cockerline*, 179 Or 229, 170 P2d 727 (1946) the dispute concerned the proceeds of lands sold before suit and which were alleged to have been partnership property. The court said that a valid partnership contract for the purpose of speculating in land could be made in parol, 179 Or at 236, but held that the agreement in question was a brokerage agreement and not a partnership contract.

In *Huffstutter v. Lind*, supra, a partnership interest in real property was claimed, based on an alleged oral agreement to buy the property jointly. The

court held there was insufficient evidence of a partnership and that the agreement, being simply for the common ownership of land, was within the statute of frauds.

■ The decision in *Flower* contained two limitations which we have emphasized by italics in the quotation. These limitations, if retained, would make the rule adopted there inapplicable in the present case. The first is that the purpose of the partnership be not to buy and hold land, but to buy and sell it and share the profits. The opinions in *Page-Dressler* and *Huffstutter* appear to assume that the *Flower* rule would apply to a partnership for the purpose of buying and operating real property for profit. Although the discussion of the statute of frauds problem in *Page-Dressler* was dictum, and extended analysis was not necessary in *Huffstutter,* there is no obvious reason for distinguishing between the two types of partnerships. In both types of enterprises the land is treated as a commodity; the purpose of the association is to realize profits from the land, whether by resale or by rental or other income-producing operation. In fact, a single partnership may be formed in contemplation of both types of dealings in land. In determining whether the association may be validly organized under an oral agreement, the precise method of doing business which the parties contemplate seems immaterial.

The second limitation is that the agreement was sought to be enforced only as to the profits after the land was sold, and that the title to the land itself was not in controversy. In all of the above cases except *Huffstutter* the property had in fact been disposed of before suit, so that neither its legal nor equitable title

638

was involved in the litigation. In *Huffstutter* the assumption that had a partnership agreement been proved it would have been outside the statute was not supported by any citation of authority.

In some cases the courts, relying on the general rule that an oral agreement to form a partnership to deal in land is not within the statute of frauds, have proceeded to enforce the terms of such agreements even though the land itself is involved in the litigation. *Ingram v. Johnston,* 38 Cal App 234, 176 P 54 (1918); *Duncan v. Johnson,* 89 Kan 21, 130 P 655 (1913); *Bakke v. Keller,* 220 Minn 383, 19 NW2d 803 (1945); *Lanier v. Looney,* 2 SW2d 347 (Tex Civ App 1928). In other cases the same result has been reached by the imposition of a constructive trust. The theory of these cases is that the party acquiring the property and claiming it as his own has violated his fiduciary duties as a partner or joint venturer. *Dayvault v. Baruch Oil Corp.,* 211 F2d 335 (10th Cir 1954); *L. M. White Contracting Co. v. Tucson Rock & Sand Co.,* 11 Ariz App 540, 466 P2d 413 (1970); *Jaffe v. Heffner,* 173 Cal App 2d 512, 343 P2d 374 (1959); *Appleby v. Buck,* 351 SW2d 494 (Ky App 1961); *Raper v. Thorn,* 202 Okla 235, 211 P2d 1007, 14 ALR2d 1260 (1949); *Fitz-Gerald v. Hull,* 150 Tex 39, 237 SW2d 256 (1951). See generally, Crane and Bromberg, Partnership 224-227, § 39; 5 Bogert, Trusts and Trustees 185-190, § 488 (2d ed 1960); 5 Scott on Trusts 3537-3546, § 499 (3d ed 1967); see, also, Restatement, Restitution § 194 and accompanying Comments.

■ As we have said, the evidence indicates that defendant was acting on behalf of the partnership when he bid on the firehouse property. Our statutes recognize that title to partnership property may be in

the name of a single partner. ORS 68.220 (3), (4). When defendant repudiated plaintiff's rights in the property, he violated his duty as a fiduciary and plaintiff is entitled to relief in a court of equity. The trial court properly decreed that defendant holds the equitable title to the land in trust.

■ Defendant also contends that because plaintiff has paid nothing toward the acquisition of the firehouse property he should be denied relief under the maxim that "he who seeks equity must do equity." In *Dickerson v. Murfield,* 173 Or 662, 669, 147 P2d 194 (1944) we quoted with approval from Pomeroy's Equity Jurisprudence a passage pointing out that this maxim is not employed to deny the plaintiff relief; instead it directs the court to grant the relief to which plaintiff is entitled on condition that the defendant's equities are also protected by appropriate relief. The decree of the trial court in this case, directing an accounting, properly requires plaintiff to bear his share of all costs and expenses, and plaintiff has made no objection to this requirement. Defendant's rights have been provided for, and plaintiff required to "do equity."

The decree of the trial court is affirmed.