Argued April 1, affirmed June 12, 1975

HARESTAD, *Respondent, v.* WEITZEL, *Appellant.*

536 P2d 522

*George M. Joseph,* of Bemis, Breathouwer & Joseph, Portland, argued the cause for appellant. With him on the brief was Sherman B. Kellar, of Engel and Kellar, Portland.

*Ralph Bolliger,* of Myatt, Bolliger, Hampton & Tarlow, P.C., Beaverton, argued the cause and filed the brief for respondent.

TONGUE, J.

This is a suit for an accounting upon the dissolution of a partnership. The principal issue is whether plaintiff is entitled to share as a partner in

profits from the sale of an apartment complex in Beaverton built on land purchased by defendant in his individual name and financed by his funds. Defendant appeals from an adverse decree. We affirm.

Defendant assigns as error the findings and conclusions of the trial court and "portions of its decree" to the effect that the parties had agreed that the apartments were partnership property and that plaintiff, therefore, was entitled to a one-half interest in the apartments and in the profits from that sale.

*The facts.*

Plaintiff was a licensed real estate broker. Defendant was a licensed real estate salesman. Defendant had some $200,000 in funds available for investment in real estate projects. The property and funds available to plaintiff totaled approximately $40,000.

In August or September 1970 plaintiff and defendant made an oral agreement to be partners in the real estate and building business and open an office with a sign which read: "Harestad & Co.—Realty—Builders—Residential-Commercial-Acreage." Defendant testified, however, that he was interested only in building houses and that there was no discussion of apartment complexes at that time. They then opened a partnership checking account with checks printed "Harestad & Co. Realty" with space for signatures of both partners on all checks. Defendant provided $1,500 in funds, a portion of which was used to open that account, and plaintiff gave him her note for $750, which she later paid. Each later contributed an additional $500.

In October 1970 a five-acre tract of unimproved land, suitable for the construction of an apartment complex, was purchased in the name of defendant, with funds provided by him. Defendant then made arangements for an architect, for contractors, and for financ-

ing for construction of the apartments, based upon his financial statement and upon a note and mortgage signed by him. Construction was started in March 1971.

In July 1971, prior to completion of the apartments, the property, to include the apartments, was sold under an earnest money agreement naming defendant as the seller. The down payment, however, was deposited in the partnership account, as were the monthly payments under the subsequent contract of sale, dated May 1, 1972. The monthly mortgage payments were also paid from that account and defendant was reimbursed from that account for payments totaling $79,965 previously made by him as an individual.

Defendant testified that upon completion of the sale of the apartments (for $629,332) he thought that $15,000 would be a "fair commission" to the partnership, with the result that each partner drew $7,500 at that time. Plaintiff, however, denied that there was any discussion of a "commission" at that time and in defendant's deposition he had testified that when each partner drew $7,500 "there was no discussion" about it "being a commission." Plaintiff offered testimony that the usual commission on a sale for that price would have been considerably larger. In any event, after that withdrawal of $15,000 some funds remained for payment of remaining bills arising from the construction of the apartment complex.

It also appears that previous payments for items such as a payment to the City of Beaverton for a "plan check fee" and numerous payments to subcontractors were made by check from the partnership account and that payments previously received, such as a payment from the city for an easement through the property, two payments from insurance companies for vandalism damage to the apartments, and the balance of funds remaining after payments to contractors from

loan funds in escrow from the lending agency were deposited in the partnership account.

Meanwhile, in August 1971, plaintiff and defendant signed a form "Articles of Co-Partnership" dated (by error) as of September 1, 1969 (instead of 1970), for the purpose of carrying on the business of "Real Estate and building" under the name of "Harestad & Co. Realty" and stating that the capital of the partnership "shall be $1,250 each," representing the amounts previously paid by each partner. Again, defendant testified that his intent in the use of the words "and building" was the building of houses.

There was also testimony, much of which was denied by defendant, relating to time and effort devoted by plaintiff in connection with the apartment project, including meetings with city officials in connection with permits; consultations with architects; selection of carpeting, tile and appliances; daily visits to the construction site; the keeping of all books and records for the project; and arrangements for payments to contractors to be made by the lending agency.

The income tax returns for the partnership and for the two parties as individuals are not entirely clear with reference to the apartment project. The only reference to that project in the 1970 partnership return is a deduction for a "plan inspection fee." However, the property for that project was not purchased until October 22, 1970, and construction did not start until March 1971.

With reference to the tax returns for 1971, plaintiff testified that in February 1972 she and defendant talked with Mr. Kaster, the accountant who prepared the partnership returns (who was also her personal accountant) and with defendant's personal accountant about the handling of deductions for expenses from the apartment project and that the defendant's

accountant told her that "it was a partnership item" and that it was proper for her in her individual return to claim a deduction for one-half of such expenses, which was then done in her tax return for 1971.

Defendant's tax return for 1971 also showed deductions so as to indicate a 50 per cent interest in the apartments. Defendant would explain this on the basis that he had "sufficient other deductions for that year so that he would have a refund coming and could not take advantage of everything he could have deducted." Mr. Kaster testified that he talked with defendant's accountant before preparing plaintiff's return for 1971. Defendant's accountant was not called as a witness. The partnership return for 1971 makes no reference to the apartment project.

The partnership return for 1972 showed as an account receivable the balance due from sale of the apartments. That return was prepared by Mr. Kaster. Plaintiff testified that she and defendant went together to meet with Mr. Kaster and with an attorney prior to the preparation of that return and took with them the records relating to the apartment project. Mr. Kaster testified that "she brought the books in." Defendant denied talking to Kaster until later. That tax return was apparently signed only by plaintiff and was subsequently objected to by defendant's attorney.

In August 1972 defendant had a heart attack and was unable to work "full time" again until the spring of 1973. On November 6, 1972, the partnership was terminated. At that time both parties went to see defendant's lawyer, who drafted a proposed dissolution agreement, under which plaintiff's one-half interest in the apartment project would have been recognized. Plaintiff testified that defendant "dictated" the terms of that agreement and that her only objection to it was that the handling of incoming contract payments and the making of mortgage payments should be done in

escrow, but that defendant objected to that proposal and that "that is where our problem began." Defendant denied "dictating" the terms of that proposed draft agreement (which was received in evidence "under the rule"), or agreeing to its proposed terms. He testified that this was "the first time" he "became aware that she claimed an interest" in the apartments.

The subsequent dissolution agreement, as well as escrow instructions, both of which also recognized that interest in plaintiff, were then prepared by plaintiff's lawyer and were signed by both plaintiff and defendant, who testified, however, that when he signed he did not intend that the agreement be delivered and that later on the same day he tore "in two" that dissolution agreement and saw another lawyer. Since November 1972 defendant has retained all of the monthly contract payments.

*Under the facts of this case plaintiff is entitled to share as a partner in the profits from the sale of the apartment complex.*

In *Roberts v. Mariner,* 195 Or 311, 245 P2d 927 (1952), involving the similar question whether both of the two partners in a real estate brokerage business were entitled to share in profits from the construction and sale of houses on land owned by one of the two partners, this court (at 350) approved the following rule:

" 'As between partners, the scope of the partnership business is determined by the provisions of the partnership agreement, or by the conduct of the partners and their course of dealing. * * * *The scope of the partnership may be expanded by the mutual consent of the partners, and such change may be evidenced by written or oral agreement,* or by the conduct of the parties. * * *' " (Emphasis theirs)

■ Under the facts of this case, we believe that the

purchase, development and sale of this apartment project was within the scope of the business of this partnership as defined by the express terms of the written partnership agreement to the effect that the purpose of the partnership was for the business of "real estate and building." And even if such a result is not clear from those terms of that written agreement, we believe that the same result must follow from the conduct of the partners and their course of dealing, as evidenced both by the testimony of the partners and others and by the numerous documents, as previously described.

■ We recognize that much of the testimony is conflicting. We also recognize that such a case must be proved by "clear and satisfactory evidence," as contended by defendant and that in such an appeal in equity we have the duty to "consider and weigh all facts in the case and to arrive at our own independent conclusion as to wherein lies the truth." *Meads v. Stott*, 193 Or 509, 541, 238 P2d 256, 239 P2d 594 (1952), cited by defendant.

Nevertheless, after a review of the entire record, much of which is documentary in form, and after according no more than what we consider to be the proper weight to the findings by the trial judge based upon his opportunity to observe the witnesses and their demeanor at the time of trial, we find that we are in agreement with the findings and conclusions of the trial court and with those "portions of its decree" which are the subject of defendant's assignments of error.

*Defendant's contentions.*

Defendant contends that in such a case there must be proof of an agreement to share profits and losses in "certain proportions," in addition to proof of the existence of a partnership, citing *Cogswell v. Wilson et al*, 11 Or 371, 4 P 1130 (1884), and *Flower v.*

*Barnekoff,* 20 Or 132, 25 P 370 (1890), and that any presumption of a partnership is "rebutted by a mere showing that the only consideration for the agreement was the rendition of services," citing *Devereaux v. Cockerline,* 179 Or 229, 170 P2d 727 (1946).

■ The cases relied upon by defendant, however, were cases in which the issue to be decided was whether there was a partnership at all, not whether the scope of an established partnership extended to a given transaction, as in this case. The written partnership agreement here provides that the parties shall contribute "$1,250 each" to the capital of the partnership and that profits are to be "divided" and losses "borne" by the parties "in the aforesaid proportion of their interest" in the partnership. Thus, because the parties each contributed equal amounts to the capital of the partnership, as provided in the partnership agreement, it follows that they were also to share profits and losses equally with respect to all matters within the scope of the partnership business of "real estate and building." It also follows that because we have held that the apartment project was within the scope of the partnership business the profits and losses from that project are to be shared equally, as for all other partnership business.

Defendant also contends that even assuming the existence of a partnership, when it is claimed that there was a partnership "with respect to a particular * * * piece of property," there must be proof of a "community of interest" between the partners with respect to that property, and that "the question is whether as a part of that partnership the parties clearly had a complete and full agreement that [this apartment complex] would be a partnership asset." Assuming, but not deciding that this is a correct analysis, we nevertheless hold that the evidence in this case, as previously reviewed, was sufficient to satisfy such a

test. We have examined the cases cited by defendant and believe that none of them requires a contrary result as applied to the facts of this case.[1] See *Roberts v. Mariner, supra,* 195 Or at 348.

Finally, defendant contends that a partnership agreement extending to the apartment project "is one squarely within the ambit of the statute of frauds," so that oral proof of such an agreement is prohibited by the terms of ORS 41.580(1), (5), and was therefore inadmissible.[2]

 It is the established rule in Oregon that a partnership agreement which has for its purpose the purchase, improvement and sale of real estate for profit is not within the operation of the statute of frauds. *Flower v. Barnekoff, supra,* 20 Or at 138; *Huson v. Portland & Southeastern Ry Co.,* 107 Or 187, 208, 211 P 897, 213 P 408 (1923); *Devereaux v. Cockerline, supra,* 179 Or at 236. Where title to real property is involved, the same rule applies and a court may properly decree that one partner holds the title to the

---

[1] Cases cited by defendant in support of this proposition include *First Nat. Bank of Eugene v. Williams,* 142 Or 648, 20 P2d 222 (1933); *Willis v. Crawford,* 38 Or 522, 63 P 985, 64 P 866 (1901); *Hayes v. Killinger,* 235 Or 465, 385 P2d 747 (1963); *Holvey v. Stewart,* 265 Or 242, 509 P2d 17 (1973); and *Terry v. Simmons,* 261 Or 626, 496 P2d 11 (1972).

[2] ORS 41.580 provides that:

"In the following cases the agreement is void unless it * * * is in writing and subscribed by the party to be charged * * *; evidence, therefore, of the agreement shall not be received other than the writing * * *:

"(1) An agreement that by its terms is not to be performed within a year from the making.

"* * * * *

"(5) An agreement for the leasing for a longer period than one year, or for the sale of real property, of any interest therein.

"* * * * *"

ORS 93.020 is also a "statute of frauds." Although defendant relies upon ORS 41.580(1), (5), he concedes that the two statutes "would seem to have the same effect in this case."

real property in trust for the other partner. *Terry v. Simmons,* 261 Or 626, 638-39, 496 P2d 11 (1972). See also Crane and Bromberg on Partnership 225-26, § 39 (1968).

It follows, in our opinion, that the scope of the business subject to that agreement could properly be proved by parol evidence.[9] As previously stated, we believe that under the evidence in this case the purchase, development and sale of the apartment project was within the scope of the business of this partnership as defined by the express terms of the written partnership agreement to the effect that the purpose of the partnership was for the business of "real estate building."

For all of these reasons, the 'decree of the trial court is affirmed.

---

[9] Although a written agreement may be ambiguous, parol evidence was also admissible to establish the intended meaning and scope of the terms of that agreement. Cf. *Higgins v. Insurance Co. of N. America,* 256 Or 151, 156-57, 469 P2d 766 (1970).